**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Henry BOOKER, Defendant–Appellant.**

**No. 95–1747.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1995.

Decided Nov. 16, 1995.

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Dyer, IN, for United States.

Paul J. Newman, South Bend, IN, Thomas A. Durkin (argued), Michigan City, IN, for Henry Booker.

Before CUMMINGS, ESCHBACH and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

This appeal presents the question of whether the statutory and sentencing guideline provisions mandating separate penalties for the distribution of "cocaine" and "cocaine base" are ambiguous. Henry Booker pled guilty to the distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1). He received a sentence of 20 years of imprison-

ment.[1]  Booker was sentenced under the statutory and guideline provisions for "cocaine base."  If the penalties for "cocaine" had been applied, his sentence would have been approximately halved: his guideline range would have been 100–125 months.

Booker argues that in scientific terms, "cocaine" and "cocaine base" are synonymous.  According to Booker, a scientist attempting to interpret the statutory and guideline provisions would not know whether to sentence him for "cocaine" or "cocaine base."  Thus, he contends that the rule of lenity should apply and that he should be sentenced under the lesser penalties specified for "cocaine."  Because we do not agree that the statutory and guideline provisions are ambiguous, we affirm Booker's sentence.

## I.  The Sentencing Provisions

### A.  Statutory Provisions

In 21 U.S.C. § 841(b), Congress set forth mandatory minimum sentences for certain offenses involving the distribution of controlled substances.  Under § 841(b), the mandatory minimum sentence for a given quantity of "cocaine base" is equivalent to the statutory minimum for 100 times that amount of "cocaine."  Section 841 contains two tiers of statutory minima.  First, § 841(b)(1)(B)(iii) sets a mandatory minimum of 5 years for offenses involving "5 grams or more of a mixture or substance . . . which contains cocaine base."  In contrast, the 5–year minimum does not apply unless the

defendant is held responsible for at least 500 grams of "a mixture or substance containing . . . cocaine, its salts, optical and geometric isomers, and salts of isomers."  *Id.* at § 841(b)(1)(B)(ii)(II).  Second, a 10–year mandatory minimum applies to offenses involving 50 grams or more of cocaine base or 5 kilograms or more of cocaine.  21 U.S.C. § 841(b)(1)(A).  Neither § 841 nor any other statute defines the terms "cocaine" or "cocaine base."

### B.  Guideline Provisions

Under the guidelines, the base offense level for offenses involving a quantity of cocaine base is the same as the offense level for offenses involving 100 times that quantity of cocaine.  For example, Booker was held accountable for 500 grams to 1.5 kilograms of cocaine base.  This gave him a base offense level of 36.  U.S.S.G. § 2D1.1(c)(2).  In comparison, level 36 is applied to offenses involving 50 kilograms but less than 150 kilograms of cocaine.  *Id.*  If Booker's offense had involved cocaine, his base offense level would have been 26.  *Id.* at § 2D1.1(c)(7).

The guidelines do not offer a definition of "cocaine" and until recently did not define "cocaine base."  An amendment that became effective in November 1993 defines "cocaine base" as "crack."  U.S.S.G. § 2D1.1; U.S.S.G.App.C, Amendment 487.[2]  However, the 1990 version of the guidelines was used in this case.[3]  Amendment 487 represents a

1.  Booker was held accountable for between 500 grams and 1.5 kilograms of cocaine base.  The cocaine base guideline gave him an adjusted offense level of 37 and a criminal history category of IV, yielding a sentencing range of 292–365 months.  However, under his plea agreement, Booker faced a statutory maximum sentence of 20 years (240 months) of imprisonment.  R. 73, Plea Agreement ¶ 9(e); *cf.* 21 U.S.C. § 841(b)(1)(C).  Accordingly, the court imposed a sentence of 240 months.  We note that we are unsure why the 20–year statutory maximum under § 841(b)(1)(C) was applied to this case.  Section 841(b)(1)(C) states that it applies to offenses involving "a controlled substance in schedule I or II except as provided in subparagraphs (A), (B), and (D).  The quantity of cocaine base involved in this case appears to qualify Booker for a sentence of 10 years (minimum) to life (maximum) under § 841(b)(1)(A)(iii), so it does not appear that § 841(b)(1)(C) should apply.  The

reasons for the district court's decision to apply subparagraph (C), however, are not clear from the record on appeal, and the government has not argued on appeal that the 20–year maximum should not have been applied.  Thus, any potential argument that subparagraph (C) was erroneously applied is waived.

2.  The definition reads as follows:

"Cocaine base," for the purposes of this guideline, means "crack."  "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rock-like form. *Id.*

3.  If applying the version of the guidelines in effect at the time of sentencing would violate the ex post facto clause of the Constitution (*e.g.,* if

substantive change to the text of the guidelines rather than a clarification to the guidelines' commentary. *United States v. Camacho*, 40 F.3d 349, 354 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995). Amendments that include substantive changes are not applied retroactively unless the Sentencing Commission so specifies. *Id.; see also United States v. Alvarez*, 914 F.2d 915, 917 n. 1 (7th Cir. 1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). The Commission has not specified that Amendment 487 applies retroactively.[4] Thus, Amendment 487 does not apply to Booker's case, so the terms "cocaine" and "cocaine base" are not defined by either the statute or the guidelines for the purposes of this appeal.

## II. Scientific Definitions of Cocaine and Cocaine Base

At sentencing, Booker and the government stipulated to the testimony of several scientists that appears in the transcript of the sentencing hearing in *United States v. Davis,* 864 F.Supp. 1303 (N.D.Ga.1994). The transcript was placed into the record as evidence. The scientists who testified were James Woodford, a defense witness, John Marshall Holbrook, an expert called by the court, and Joey Douglas Clarke, a scientist employed by the Drug Enforcement Agency who was called by the government. The three witnesses agreed on a number of basic points concerning the chemical properties of cocaine and cocaine base, of which we will take judicial notice.[5]

Cocaine in its naturally occurring form is a base [6] with the chemical formula $C_{17}H_{21}NO_4$.[7] *Davis* Tr. at 6. Because cocaine is a base, the phrase "cocaine base," in scientific terms, is redundant. To a scientist, "cocaine" and "cocaine base" are synonymous; they both refer to a substance with the formula $C_{17}H_{21}NO_4$. *Id.* at 29, 111, 169.[8]

Cocaine, however, is rarely used in its naturally occurring form, at least in the United States. Before cocaine is imported into the United States, it is generally converted into cocaine hydrochloride, more commonly known as powder cocaine. This process involves two steps. First, coca leaves are converted into coca paste "by mixing the leaves with an alkaline material (*e.g.,* sodium bicarbonate),[9] an organic solvent (*e.g.,* kerosene), and water." *Id.* at 11.[10] Second, the coca paste is dissolved in hydrochloric acid and water. The hydrochloric acid (an acid) combines with the cocaine (a base) to produce a

---

the guidelines were amended to the defendant's detriment after the offense was committed), the court should apply the version in effect at the time of the commission of the offense. *United States v. Harris,* 41 F.3d 1121, 1123 (7th Cir. 1994); U.S.S.G. § 1B1.11(b)(1). The district court held that the 1990 version was "less onerous" than the edition in effect at sentencing. R. 119, Sentencing Memorandum at 1. Neither the government nor Booker contest the district court's determination that the 1990 guidelines apply to this case.

4. The guidelines contain a list of Amendments to be applied retroactively, and Amendment 487 does not appear in that list. *See* U.S.S.G. § 1B1.10(c).

5. At Booker's sentencing hearing, the district court did not make any factual findings concerning the chemical properties of cocaine and cocaine base. This, however, is general knowledge of which we may take judicial notice. *See Daubert v. Merrell Dow,* —— U.S. ——, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (court may take judicial notice of well-established scientific facts).

6. The definition of a base (or at least an adequate definition for present purposes) is a substance that when combined with an acid produces a salt. *See United States v. Palacio,* 4 F.3d 150, 153 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1194, 127 L.Ed.2d 543 (1994).

7. This notation means that each molecule of cocaine contains 17 carbon atoms, 21 hydrogen atoms, one nitrogen atom, and four oxygen atoms.

8. Holbrook testified that "[T]here is a definite consensus in the scientific area for the meaning of cocaine base. It is what's already been stated today[;] cocaine base is the naturally occurring form of cocaine found in the coca plant." *Id.* at 111.

9. Sodium bicarbonate is commonly known as baking soda.

10. "[C]oca paste is a base form of cocaine (similar to freebase cocaine and crack cocaine)." *Id.* Coca paste is smokable but is not usually imported into the United States. *Id.* at 11–12.

salt, cocaine hydrochloride. *See id.* at 12.[11] This salt, known as powder cocaine, is easily dissolved in water, and it may be ingested, insufflated (snorted), or injected.[12] It is not smokable, however, because cocaine hydrochloride decomposes at approximately the same temperature at which it vaporizes; thus, smoking cocaine hydrochloride produces no "physiological or psychotropic effects" (*i.e.*, the user will not experience a "high" because the cocaine has decomposed). *Id.* at 12–13. The chemical formula of cocaine hydrochloride is $C_{17}H_{22}ClNO_4$.[13] *Davis* Tr. at 44.

Cocaine hydrochloride may be converted into what is referred to as freebase cocaine or cocaine freebase. Essentially, "freebase" means that the base (cocaine) is "freed" from the hydrochloride and converted into the same chemical state it was in before it became a salt. *See Davis* Tr. at 17. Freebase can be manufactured in different ways. In the 1970s, freebase would generally be made by dissolving cocaine in ammonia and adding ether or another organic solvent. *See id.* at 14; *Cocaine and Federal Sentencing Policy* at 13. This process, however, is dangerous to both the producer and the user because ether is flammable. *Cocaine and Federal Sentencing Policy* at 13.[14] A safer process for manufacturing freebase cocaine involves dissolving cocaine hydrochloride in baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry. *Id.* at 14; *see also Davis* Tr. at 17. The result of this latter process is commonly

known as crack. *Cocaine and Federal Sentencing Policy* at 14.[15] Freebase cocaine has a lower melting point than cocaine hydrochloride, so it can be smoked without the active ingredient (cocaine) decomposing. *Davis* Tr. at 14.[16] Freebase cocaine, however, is not water soluble (does not dissolve in water), so it cannot be injected or snorted. *See id.* at 144–45. All forms of freebase cocaine, including crack, have the same chemical formula as cocaine: $C_{17}H_{21}NO_4$. *Id.* at 13.

### III. Are the Sentencing Provisions Ambiguous?

■ The sentencing schemes in § 841(b) and § 2D1.1 are widely considered to establish two tiers of penalties for offenses involving cocaine: higher penalties for "crack" cocaine and lesser penalties for powder cocaine. Our task, at least in this case, would be easy if the provisions simply said "crack" and "powder." The problem is that they do not; instead, they specify "cocaine" and "cocaine base." The scientific evidence introduced by Booker shows that the terms "cocaine" and "cocaine base" refer to the same substance— a base with the chemical formula $C_{17}H_{21}NO_4$. A scientist trying to determine which sentencing provision applies to Booker would conclude that both apply because the crack cocaine that he distributed is a substance with the chemical formula $C_{17}H_{21}NO_4$. Thus, Booker argues that the sentencing provisions are ambiguous.[17]

11. The process involves other steps as well, but they are not repeated here because they are not necessary to understanding the chemical structure of cocaine and cocaine base.

12. Users who inject cocaine first dissolve it in water and then inject it into a vein with a hypodermic syringe. *Id.* at 21.

13. This notation means that each molecule of cocaine hydrochloride contains 17 carbon atoms, 22 hydrogen atoms, one chlorine atom, one nitrogen atom, and four oxygen atoms.

14. In 1980, entertainer Richard Pryor received third-degree burns when freebasing cocaine made with ether. *Id.*

15. Crack is a street name for this substance rather than a scientific term. *See Davis* Tr. at 154–55.

16. Freebase cocaine is not actually "smoked" (it does not produce smoke that is inhaled); rather, it is melted and the vapors are inhaled. *Id.* Inhaling cocaine vapors is referred to as freebasing. *Id.*

17. No such potential ambiguity exists with respect to powder cocaine. Powder cocaine is a salt of cocaine with a different chemical formula ($C_{17}H_{22}ClNO_4$) from crack or pure cocaine. Under § 841(b), salts are covered by the lesser statutory minima only. *See* §§ 841(b)(1)(A)(ii)(II), 841(b)(1)(B)(ii)(II). In addition, because powder cocaine is a salt form rather than a base form of cocaine, it does not qualify as "cocaine base."

In *United States v. Blanding*, 53 F.3d 773 (7th Cir.1995), this court rejected the defendants' argument that § 841(b) is ambiguous, stating that "Congress has defined the substance [cocaine base] ... with appropriate clarity." *Id.* at 776. Booker urges us to revisit *Blanding* in light of the aforementioned scientific evidence. The *Blanding* court did not have the benefit of the extensive scientific evidence presented in this case.

When presented with this same scientific evidence, the *Davis* court held that "[b]ecause ... the definitions [of cocaine and cocaine base] are identical, there is unquestioned ambiguity on the face of the statute." *Davis*, 864 F.Supp. at 1306. Thus, the court applied the rule of lenity. *Id.* Given the agreement among all three scientists (the defense expert, court expert, and government expert) that the terms "cocaine" and "cocaine base" refer to the same substance— a base with the chemical formula $C_{17}H_{21}NO_4$—we are compelled to conclude that we cannot discern from the plain language of either the statute or the pre–1993 guidelines which punishments apply to crack cocaine. Our examination of the meaning of the sentencing provisions, however, does not end with the plain language. Before concluding that the provisions are ambiguous, we must examine the "language, structure, legislative history, and motivating policies" for evidence of what Congress and the Sentencing Commission intended. *United States v. R.L.C.*, 503 U.S. 291, 305–06, 112 S.Ct. 1329, 1338–39, 117 L.Ed.2d 559 (1992) (plurality opinion). The rule of lenity does not apply unless, "after a court has 'seize[d] [on] everything from which aid can be derived, it is still left with an ambigu[ity].'" *Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991), *quoting United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971).[18]

Despite the extensive scientific evidence introduced by Booker that cocaine and cocaine base are actually the same substance, the legislative history of § 841(b) demonstrates that Congress intended the terms to have different meanings. Whereas the *Davis* court was bound by then-existing Eleventh Circuit precedent to define cocaine and cocaine base according to their scientific meaning, *Davis*, 864 F.Supp. at 1306, this circuit has no such precedent. Thus, we may examine the legislative history to aid our understanding of the terms.

In 1986, Congress passed the Anti–Drug Abuse Act (ADAA), which established the enhanced penalties for cocaine base. The history of the ADAA reveals that Congress was targeting crack cocaine when it passed the stiffer sentencing provisions for "cocaine base." First, a number of legislators applauded the ADAA and related legislation for providing enhanced penalties for offenses involving crack. *See, e.g.,* 132 Cong.Rec. S13741–01 (Sept. 26, 1986) (statement of Sen. Chiles) ("We have enhanced the penalties for drugs, but especially for crack cocaine."); *cf.* 132 Cong.Rec. S15934–01 (Oct. 10, 1986) (statement of Sen. Chiles) (the act includes "mandatory penalties especially dealing with crack cocaine"); 132 Cong.Rec. S14270–01 (Sept. 30, 1986) (statement of Senator Riegle) (the act "updates the Controlled Substances Act to include new and devastating drugs like 'crack' and designer drugs"). In addition, Congress held hearings where experts testified concerning the emergence of crack cocaine and the dangers that it poses. *See*

---

**18.** Because we find no ambiguity in the sentencing provisions, *see infra*, we need not consider the government's argument that the rule of lenity does not apply to the sentencing guidelines. This court has intimated in dicta that the rule of lenity may not apply to the guidelines. *See United States v. White*, 888 F.2d 490, 497–98 (7th Cir. 1989); *see also United States v. Nelson*, 29 F.3d 261, 264 (7th Cir.1994); *United States v. Mrazek*, 998 F.2d 453, 455 (7th Cir.1993). The *White* court found no ambiguity in the challenged guidelines provision, but it noted that while the rule of lenity is "useful in understanding statutory minimum and maximum penalties as well as in defining the elements of offenses," it may not have "much role to play in interpreting the Guidelines." *White*, 888 F.2d at 497. This discussion in *White*, however, is dicta, and every other court to consider the issue has held that the rule of lenity applies to the guidelines. *See United States v. Cutler*, 36 F.3d 406, 408 (4th Cir.1994); *United States v. Martinez*, 946 F.2d 100, 102 (9th Cir.1991); *United States v. Schultz*, 810 F.Supp. 230, 234 (S.D.Ohio 1992).

*"Crack" Cocaine, Hearing before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate,* 99th Cong., 2d Sess. (July 15, 1986); *The Crack Cocaine Crisis, Joint Hearing before the Select Committee on Narcotics Abuse and Control, House of Representatives, and the Select Committee on Children, Youth, and Families, House of Representatives,* 99th Cong., 2d Sess. (July 15, 1986). Finally, during the spring and summer of 1986 (when the ADAA was being discussed), Members of the Senate and the House of Representatives gave much attention to the necessity of addressing the problem of crack cocaine. *See* S.Res. 464, *Designating "Crack/Cocaine Awareness Month,"* 132 Cong.Rec. S11266–01, 99th Cong., 2d Sess. (Aug. 11, 1986); *Crack,* 132 Cong.Rec. S00000–24 (Aug. 7, 1986); *Time for Higher Awareness About Crack/Cocaine,* 132 Cong. Rec. E2528–03 (July 22, 1986); *Rock and Crack Cocaine,* 132 Cong.Rec. S00000–22 (June 17, 1986); *"Crack"—Epidemic in Need of a Cure,* 132 Cong.Rec. E2328–01 (June 6, 1986); *Crack and Crime,* 132 Cong.Rec. S7123–01 (June 9, 1986); *What Parents Don't Know About Crack,* 132 Cong.Rec. S5436–03 (May 6, 1986); *The Urgent Need to Attack "Crack,"* 132 Cong.Rec. E944–01 (Mar. 21, 1986).[19]

At least one other circuit has concluded that no ambiguity exists because the legislative history reveals that Congress intended "cocaine base" to mean crack. In *United States v. Fisher,* 58 F.3d 96 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 329, 133 L.Ed.2d 229 (1995), the Fourth Circuit rejected the argument that the sentencing provisions are ambiguous, holding that the enhanced penalties apply to crack and the lesser penalties apply to all other forms of cocaine. *Id.* at 99; *see also United States v. Munoz–Realpe,* 21 F.3d 375, 377–78 (11th Cir.1994) (defining "cocaine base" as crack under 21 U.S.C. § 960(b)); *United States v. Shaw,* 936 F.2d 412, 416 (9th Cir.1991) (defining "cocaine base" as crack under § 841(b)); *cf. United States v. Jackson,* 64 F.3d 1213, 1219–20 (8th Cir.1995) (rejecting argument that sentencing provisions for cocaine and cocaine base are ambiguous).[20] We agree with the *Fisher* court's reasoning. In 1986, Congress was concerned about the emergence of a new, smokable form of cocaine that was more dangerous than powder cocaine, less expensive, and highly addictive. *See, e.g., "Crack Cocaine"* hearing at 8 (statement of Senator Chiles) ("We all are familiar with cocaine; it has been with us for a long time. Crack, however, is something altogether different. It is far more powerful, far cheaper, far more addictive, and increasingly

---

**19.** Booker argues that the "crack" cocaine that Congress was attempting to punish is different from the substance now commonly known as crack. At the *Davis* sentencing hearing, the defense expert (Woodford) testified that crack cocaine was first produced when the United States started bombing cocaine finishing labs in Bolivia. *Davis* Tr. at 6–7. According to Woodford, for a short time, the producers used an alternative method of refining cocaine, which created a drug more dangerous than today's "crack" that caused a number of highly publicized deaths. *Id.* at 9–11. However, Holbrook (the court's witness) testified that Woodford's theory has not been proven and that the large number of deaths coinciding with the appearance of crack may have occurred because "people [were] using the [new] crack form of cocaine in an amount much larger than … [they] could handle because they had no idea what they were doing." *Id.* at 130. In addition, the experts who testified at the Congressional hearings defined crack as it is generally defined today (and as it is defined in Part II, *supra* ). *See, "Crack" Cocaine hearing, supra,* at 14 (testimony of Charles R. Schuster); *The Crack Cocaine Crisis hearing, supra,* at 26 (testimony of

Jerome H. Jaffe). Thus, we believe that when Congress passed the ADAA, it intended to penalize the substance commonly known as "crack" today rather than a more dangerous drug produced when the United States was bombing cocaine refineries in Bolivia.

**20.** A few circuits, however, have noted that the term "cocaine base" has a broader scientific meaning than just crack cocaine and have thus rejected arguments that "cocaine base" means crack. *See United States v. Jackson,* 968 F.2d 158, 162–63 (2d Cir.) ("Congress used the chemical term 'cocaine base' without explanation or limitation" and "neither limited the term … in the plain language of the statute nor demonstrated an intent to do so in the statute's legislative history"), *cert. denied,* 506 U.S. 1024, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992); *United States v. Lopez–Gil,* 965 F.2d 1124, 1134 (1st Cir.) (as amended on rehearing) ("it does not necessarily follow that the term 'cocaine base' includes only crack cocaine"), *cert. dismissed,* 504 U.S. 980, 112 S.Ct. 2959, 119 L.Ed.2d 581 and *cert. denied,* 506 U.S. 981, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992).

available.").[21] Whether the dangers of crack justify the 100:1 sentencing ratio is a matter of debate; the Sentencing Commission's proposal to eliminate the disparity is evidence that some experts believe not.[22] But whatever the merits of the distinction, it is clear that Congress intended the enhanced penalties to apply to crack cocaine and the lesser penalties to apply to all other forms of cocaine. Likewise, the same concerns undoubtedly motivated the Sentencing Commission when it adopted the distinction between cocaine and cocaine base for the purposes of the guidelines.[23] Thus, we hold that the sentencing provisions for "cocaine" and "cocaine base" are not ambiguous because although the terms have the same scientific meaning, both Congress and the Sentencing Commission intended "cocaine base" to mean crack cocaine.[24]

## IV. Conclusion

The sentencing provisions for cocaine and cocaine base are not ambiguous: the enhanced penalties apply to crack cocaine, and the lesser penalties apply to all other forms of cocaine. Although the terms "cocaine" and "cocaine base" have the same scientific meaning, Congress and the Sentencing Commission intended the enhanced penalties to apply only to crack, which is defined as a form of "cocaine freebase prepared by a method which does not use solvents." *The Crack Cocaine Crisis hearing* at 130; *cf.* Part II, *supra.* Because Booker distributed crack cocaine, the sentencing provisions for "cocaine base" were properly applied. Accordingly, Booker's sentence is

AFFIRMED.

21. One reason that crack presented a more serious problem than other forms of freebase cocaine was its potential to gain wider popularity. Older forms of freebase were costly and dangerous to manufacture. Before the emergence of crack, if users wished to smoke cocaine, they "had to purchase substantial quantities of cocaine hydrochloride and then convert it themselves using flammable organic solvents, such as ether. This required special equipment and the money to purchase a significant amount of cocaine, and it involved considerable danger." *The Crack Cocaine Crisis hearing* at 26 (testimony of Jerome H. Jaffe). Crack, which can be manufactured by mixing cocaine hydrochloride with baking soda, is easy and inexpensive to produce and is not flammable. *See id.;* Part II, *supra.*

22. Earlier this year, the Sentencing Commission proposed an amendment to the guidelines that would have eliminated the disparity between crack and other forms of cocaine. *See* Notices, 60 Fed.Reg. 25074 (May 10, 1995). The amendment would have treated cocaine and crack equally for sentencing purposes. *See id.* at 25075. Congress, however, recently enacted a resolution disapproving the proposed amendment. *See* P.L. 104–38, 109 Stat. 334 (Oct. 30, 1995). Although it rejected the amendment, Congress ordered the Sentencing Commission to conduct further studies concerning the crack/cocaine sentencing disparity and to present new recommendations to Congress. *See id.* For the time being, however, the 100:1 ratio remains in place.

23. Although Amendment 487, which defines cocaine base as crack for the purposes of the guidelines, does not apply to this case, it may be evidence that the Commission's original intention was to penalize crack more heavily than other forms of cocaine.

24. Finally, Booker contends that the sentencing scheme is irrational because crack is no more dangerous than other forms of cocaine. Although it concluded that the 100:1 ratio was too high, the Sentencing Commission acknowledged that stiffer penalties for crack may be justified for several reasons. First, cocaine that is smoked (*e.g.,* crack) reaches the brain more quickly than cocaine that is snorted or injected. This produces "higher highs" and leads to a greater risk of dependence and abuse. *Cocaine and Federal Sentencing Policy* at 19–26. Second, crack can be easily distributed in single-dose quantities ranging in price from $5 to $20, making it affordable for younger individuals. *Id.* at 85. In contrast, powder cocaine is usually sold in gram quantities (five to ten doses) costing between $65 and $100. *Id.* at 86. Finally, more violence is associated with the distribution of crack than powder cocaine (often because the crack market attracts "younger, presumably more crime-prone sellers"), *id.* at 95–96, and more young people are involved in the distribution of crack than powder cocaine. *Id.* at 83–84.