

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-1999

# USA v. Holman

Precedential or Non-Precedential:

Docket 98-1307

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Holman" (1999). *1999 Decisions.* Paper 45.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/45

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-1307

UNITED STATES OF AMERICA,

v.

BRIAN HOLMAN,

        Appellant.

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Cr. No. 92-CR-00119-19)

Argued: December 2, 1998

Before: BECKER, Chief Judge, NYGAARD and
WOOD, JR.,* Circuit Judges.

(Filed February 19, 1999)

        LESLIE LEVI PAYTON, ESQUIRE
         (ARGUED)
        Leslie L. Payton and Associates
        2 Penn Center Plaza, Suite 200
        Philadelphia, PA 19102

        Attorney for Appellant

_____

* The Honorable Harlington Wood, Jr., United States Circuit Judge for
the Seventh Circuit, sitting by designation.

MICHAEL S. STILES, ESQUIRE
United States Attorney
WALTER S. BATTY, JR., ESQUIRE
Assistant United States Attorney
FRANCIS C. BARBIERI, JR.,
 (ARGUED)
Special Assistant United States
 Attorney
Room 1250
615 Chestnut Street
Philadelphia, PA

Attorneys for Appellee.

OPINION OF THE COURT

HARLINGTON WOOD, JR., Circuit Judge.

Whether it was cocaine or "crack" is the principal sentencing issue in this appeal. The district judge found it was "crack."

In June 1992, defendant-appellant Holman entered an open guilty plea to a count charging a conspiracy to distribute cocaine in excess of five kilograms, to another count charging possession with intent to distribute cocaine, and to three counts of using a telephone to facilitate a drug felony, in violation of 21 U.S.C. SS 846, 841(a)(1) and 843. His drug activities were in and around the Philadelphia, Pennsylvania area. He was sentenced to 188 months of imprisonment followed by a term of five years of supervised release. He did not appeal.

In 1995, Holman filed a motion to vacate or correct his 1992 sentence pursuant to 28 U.S.C. S 2255. The district court denied Holman's motion. This time he appealed. In March 1996, this court remanded the case for reconsideration of an issue not involved in the present appeal. The district court thereafter, in May 1996, reduced Holman's sentence from 188 months to 145 months to be followed by supervised release. Again Holman did not appeal, but in December 1996 he filed a pro se motion to vacate or correct his sentence pursuant to 28 U.S.C.

2

S 2255. The district court denied his latest motion as a second or successive motion, and Holman appealed. In December 1997, this court reversed the district court's holding and remanded the case directing the sentencing court to determine whether the government had proven that the cocaine seized from Holman was in fact "crack" and also to consider whether Holman was entitled to a third level sentence reduction for acceptance of responsibility.

In February 1998, the district court held a hearing for those purposes and determined that the cocaine was indeed "crack." After the hearing, the district court reduced Holman's sentence to 135 months to be followed by supervised release. In April 1998, Holman filed this appeal in which he argues that the government failed to prove at the sentencing hearing that a substantial portion of Holman's drugs was "crack." Holman also raises additional sentence calculation issues including whether he is entitled to a decrease in his offense level for a mitigating role in the offense pursuant to U.S.S.G. S 3B1.2; whether he is entitled to a decrease in his offense level under the "safety valve" provision, U.S.S.G. S 5C1.2; and whether he is entitled to a decrease in his offense level pursuant to U.S.S.G. S 5K1.1 for allegedly providing the government with substantial evidence in the investigation and prosecution of others.

So far Holman has, by his persistence, secured over four years reduction in his sentence.

BACKGROUND

Whether Holman's cocaine was in substantial part cocaine base known as "crack," as the government claims, makes a considerable difference in his sentence. "Given the highly severe sentencing ratio of 100:1 for crack versus cocaine . . . a sentence may vary dramatically depending on whether he sold crack or cocaine." United States v. James, 78 F.3d 851, 856 (3rd Cir. 1996). The reason for this "dramatic" sentencing enhancement was explained in United States v. Booker, 70 F.3d 488 (7th Cir. 1995). "In 1986, Congress was concerned about the emergence of a new, smokable form of cocaine that was more dangerous

3

than powder cocaine, less expensive, and highly addictive." Id. at 493. So, in 1986, Congress passed the Anti-Drug Abuse Act, which established enhanced sentences for offenses involving "cocaine base." In 1993, Congress amended Guideline S 2D1.1 to explain that"cocaine base," for the purposes of that guideline, meant "crack." " `Crack' " it was noted, "is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy rocklike form." U.S.S.G. S 2D1.1.

At Holman's "crack" sentencing hearings held in February and March 1998, the district court determined that 90.253 grams of cocaine base found in Holman's apartment were "crack" and correspondingly set Holman's base offense level at 34. Also included in that offense level determination was an additional 621.3 grams of cocaine, not "crack," possessed by Holman and stashed in a rented locker. The government did not argue that the cocaine in the locker was "crack," and its ownership is not disputed.

We must examine the government's evidence to see if it meets the burden of showing that a substantial portion of the drugs seized in Holman's apartment was "crack" as defined in the Sentencing Guidelines. For sentencing purposes, the character of the drug substance need not be shown beyond a reasonable doubt, but only by a preponderance of the evidence. United States v. Roman, 121 F.3d 136, 141 (3rd Cir. 1997), cert. denied, ___ U.S. ___ (1998). Roman makes plain, however, citing United States v. Lawrence, 47 F.3d 1559 (11th Cir. 1995), that the lesser burden of proof requires more than lip service. To carry its burden, the government must present " `reliable and specific evidence' " that the substance in question is "crack." Roman, 121 F.3d at 141 (quoting Lawrence, 47 F.3d at 1566). It is the serious duty of the district court to hold the government to this burden particularly because of the impact the identity determination has on sentencing. That responsibility can come as no surprise to the government as this court in Roman expressed its concern with the government's efforts in that case to prove the drug substance involved was "crack." Id. at 141 n.4. The "crack" evidence in Roman was found to be sufficient, "but just

barely." Id. at 140. The only crack evidence in Roman was the opinion testimony of a drug enforcement officer, not a chemist, but with years of experience, however, as a police officer. He testified that the drugs seized were packaged in "clear plastic vials with color caps" which he described as the way "crack" is commonly packaged on the streets of Philadelphia, the location of that arrest. Id. at 141. Based on this information, the testifying officer concluded that what he had seized was "crack cocaine." Id.

In the present case, at the March 1998 sentencing hearing, the government called three witnesses, all vigorously cross-examined. The first was Corporal Donahue, the supervisor of the chemical laboratory for the Philadelphia Police Department. Corporal Donahue produced the record of the chemical analysis done on Holman's drugs in 1991. The report showed who the chemist had been, the weights of the drugs, and the result of the analysis of two drug items. The drugs themselves seized at Holman's apartment in 1991, however, had been destroyed in 1994 according to police protocol and pursuant to an order of a local court. One of the two items as shown on the chemist's report was found to be cocaine base and the second item was described only as cocaine. The Corporal explained that the chemist's report referred to cocaine base rather than "crack" as the latter term is not generally used in the laboratory to further identify cocaine base.

The government next called Detective Clements, an employee of the local district attorney's office. He had served for eight years as a member of the Dangerous Drug Offenders Unit and as a member of the Philadelphia Police Department for eighteen years prior to that. Detective Clements had participated in the 1991 search of Holman's apartment and the seizure of the drugs. He explained that he seized four clear plastic bags containing an off-white-beige substance and an additional three clear plastic bags containing a white powder substance. These bags were found in the pockets of clothing in a closet in Holman's apartment. Detective Clements further testified that the off-white-beige substance appeared to be "crack" cocaine. He explained he was familiar with "crack" cocaine based on his

5

experience in the police department for as part of his duties he had purchased "crack" numerous times, seized it in the execution of search warrants, and had been with other officers when they had purchased and seized "crack."

Officer Clements described the differences in the appearances of the two items of seized narcotics. The substance designated as Item 1, he said, was harder and off-color when compared with the cocaine in Item 2 which he described as a powdery substance, lighter in color. The same appearance distinctions were revealed on the police property receipt for Holman's seized drugs which the officer provided. When seized, he explained, the substances had been kept in separate bags. Officer Clements, on cross-examination, conceded that his "crack" opinion was based on his experience and the appearance of the substances, although he could not be 100% certain. Officer Clements had conducted no field tests at the time, and he did not know if anybody else had. He explained technically how field tests are conducted. A field test, he explained, would have confirmed his initial "suspicions"; however, even without the field test, Clements had finally concluded based on his experience that one of the two substances was in fact "crack."

As its last witness, the government called Detective Rodriguez. He had been with the narcotics division of the Philadelphia district attorney's office since 1988 and for four prior years was a city police officer in the major investigation division of the city's narcotics unit. In his police career, Detective Rodriguez estimated he had purchased "crack" over fifty times. He testified how, in an undercover capacity, he would discuss drug quality with drug sellers as well as how they turned cocaine into "crack." He described how "crack" was distributed on Philadelphia streets in packets, vials, and bundles. Furthermore, he described the distinguishing characteristics of cocaine and "crack." He had testified as a narcotics expert previously in federal court in excess of ten times.

Detective Rodriguez had been present in court during the testimony of Corporal Donahue and Detective Clements. He testified that, based on their testimony and his experience,

the particular item referred to as being cocaine base would qualify as "crack" on the street. Rodriguez further testified that, in his experience, the only type of cocaine base sold in Philadelphia was "crack," although he had previously heard there was some other paste-like form of cocaine base prior to 1987. Rodriguez asserted that what he had heard described in the testimony could only be "crack," not any other form of cocaine base. On cross-examination he was unable, not being a chemist he explained, to answer some of the technical questions put to him. Rodriguez testified that although "crack" is sometimes contained in vials, none was so contained in this case as it was in bulk before being put into vials. Rodriguez testified that he did not know any of the details of Holman's case from first-hand experience as he had been directly involved in Holman's case only because the drug seizure was based on a wire intercept.

That was generally the extent of the government's "crack" evidence. There was no contrary evidence. At the conclusion of the sentencing hearing, the court gave Holman the opportunity to speak, and he did. Holman advised the court, however, that the issues he was really interested in were the Guidelines' "safety valve" provision and the S 3B1.2 mitigating circumstances provision. We will consider those other issues briefly. Holman was given the chance but failed to deny or to say any thing whatsoever about whether he had dealt in "crack."

ANALYSIS

At the conclusion of the hearing, the district judge found that Holman had possessed and had been involved in "crack" dealing. The district judge is an experienced trial judge who heard the evidence and observed the witnesses. The record reveals he kept the hearing focused on the "crack" issue and held the government to its full responsibilities under the standard of proof for sentencing. He criticized the government for not requiring the chemist personally to be present, but the chemist's report was introduced and was considered sufficient. The two police officers who testified were both very experienced in heroin and "crack" cases. One of them had been the officer who actually seized the drugs at Holman's apartment and

visually identified the "crack" based on his prior experiences. The cocaine and "crack" had been kept separate by Holman. There was little doubt considering the color, texture, and circumstances that the cocaine base was "crack." One hundred percent certainty is not required, nor is a precise chemical analysis necessary. United States v. Dent, 149 F.3d 180, 190 (3rd Cir. 1998)(citing Roman, 121 F.3d at 141). In reviewing the district court's factual findings underlying application of the Guidelines, we apply the deferential clearly erroneous standard. United States v. Fuentes, 954 F.2d 151, 152–55 (3rd Cir. 1992). We will reverse only if, after reviewing the evidence, we are left with a definite and firm conviction that a mistake has been made. Dent, 149 F.3d at 189. As we view the government's evidence, and there was none to the contrary, the district judge could only have found that "crack" was involved in sufficient quantity to justify the sentence enhancement. No clear error can be found in the district court's findings, nor is this a case of "barely enough" evidence to sustain the "crack" findings. See Roman, 121 F.3d at 140-41 (holding that evidence was sufficient to support a finding of "crack" when an experienced drug enforcement officer made a "crack" determination based solely on the manner in which the drugs were packaged).

Holman also complains that the district court denied him a decrease in his offense level for his claimed mitigating role in the offense pursuant to U.S.S.G. S 3B1.2. He had participated in a large conspiracy, but he argues that his role in that conspiracy was minor. Section 3B1.2 provides a reduction in offense level for defendants who are minor or minimal participants in an offense. To be eligible for a deduction under S 3B1.2, "[t]he defendant bears the burden of demonstrating that other participants were involved and that," under the relevant standards and the facts of his particular case, "the minor role adjustment should apply." United States v. Isaza–Zapata, 148 F.3d 236, 240 (3rd Cir. 1998). Holman fails to meet this burden.

In Isaza-Zapata, the defendant was only a one-time courier, a "mule," hired in Columbia to transport heroin to the United States on one occasion. The government agreed that Isaza-Zapata was entitled to a downward adjustment.

Isaza–Zapata unsuccessfully attempted after his arrest to be of assistance to the government in locating the United States contact. In the present case, Holman has admitted to serving as a distributor in the conspiracy. He pled guilty to possession of cocaine with intent to distribute. The record shows that the total amount of cocaine distributed by the conspiracy during Holman's involvement wasfifty kilograms. Holman concedes that of this amount ten kilograms of cocaine can be attributed to him. The district court surely did not clearly err in determining that the distributor does not play a mitigating role in a conspiracy to distribute ten kilograms of cocaine.

Holman was also particularly interested, he said, in the "safety valve" provision of the Sentencing Guidelines, S 5C1.2, but that provision does not apply in view of the sentence he received. Section 5C1.2 is designed to allow the court to "impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence," if the court finds that the defendant fulfills five criteria. In the present case, the statutory mandatory minimum was 120 months. 21 U.S.C. S 841 (a)(1). The district court determined that Holman's applicable guideline range was between 108 and 135 months and sentenced Holman to 135 months. The record evidence shows that this sentence was made with consideration of the entire applicable guideline range and without regard to the statutory minimum sentence. Even if Holman had been able to show that he met the requirements of the safety valve provision, the provisions of S 5C1.2 would be of no help to him.

Holman's final complaint is that he cooperated with the government and should have been given the sentencing benefit of a S 5K1.1 downward departure for his alleged help to the government. The government, however, found him to be of no help, explaining that Holman offered only general information which was of no government use. Holman did offer information about a particular person, but that person had already been taken into custody. Generally, a sentencing court may not depart below the guideline range based on a defendant's cooperation unless the government makes a motion to permit such a

departure. U.S.S.G. S 5K1.1 ("Upon motion of the government stating that the defendant has provided substantial assistance . . ., the court may depart from the guidelines."); see also United States v. Abuhouran, 161 F.3d 206, 211–12 (3rd Cir. 1998). It is the government's prosecutorial decision whether or not to seek a downward departure under S 5K1.1 where a defendant claims to have been of assistance to the government. That is an executive branch discretionary decision ordinarily entitled to deference in these circumstances. United States v. Paramo, 998 F.2d 1212, 1221 (3rd Cir. 1993). Federal courts do have the power to review a prosecutor's refusal tofile a S 5K1.1 motion and to grant a remedy, but only if the refusal was based on bad faith, if a plea agreement otherwise required the government to consider offering a S 5K1.1 departure motion, or on an unconstitutional motive. Abuhouran, 161 F.3d at 212. At oral argument, counsel for Holman conceded that he did not allege that the government acted either in bad faith or with an unconstitutional motive. Holman, therefore, is not entitled to a S 5K1.1 departure.

Holman's assertions of trial court error all lack merit. Therefore, the district court is affirmed in respects.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit