In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3555

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEXTER WAYNE BETTS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 699-3—**David H. Coar,** *Judge.*

ARGUED MAY 28, 2009—DECIDED AUGUST 12, 2009

Before EVANS, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Dexter Betts pleaded guilty to distributing more than fifty grams of cocaine base. Increased penalties apply to the distribution of crack, but not to other forms of cocaine base. Betts objected to the government's characterization of the substance as crack, but after a two-day sentencing hearing, the district court found that the substance was crack and sentenced Betts to 140 months' imprisonment. Betts contends that the

evidence presented was insufficient to establish that the substance was crack and relies on ambiguous comments that the judge made in the course of sentencing to argue that the court's finding was flawed. But a reading of the record as a whole shows that the court permissibly relied on the testimony of an experienced investigating officer and did not err in finding that the substance Betts sold was crack. So we affirm the judgment of the district court.

## I. BACKGROUND

In June 2006 the Chicago Police Department began investigating reports of an open air drug market on the south side of Chicago. On September 9, 2006, Sergeant Ronald Kimble, operating undercover, arranged to purchase half a kilogram of crack from Betts's codefendant, Timothy Person. Both Betts and Person arrived at the agreed sale location, where Betts supplied Person with two plastic bags, each containing large chunks of a white, rocky substance. Person then sold the bags to Sergeant Kimble, who paid him $11,000 in pre-recorded bills. Person gave a portion of the money to Betts. After the exchange, Sergeant Kimble asked Betts how much he would charge for a whole kilogram of crack, to which Betts responded $16,000. Officers arrested Betts a few blocks away and found $7,200 in pre-recorded bills in his possession.

Betts was initially charged in a criminal complaint with conspiring to distribute in excess of fifty grams of crack. *See* 21 U.S.C. §§ 841(a)(1); 846. In October 2006 a grand jury returned a multi-count superseding indictment,

which charged Betts with conspiring with five other codefendants to distribute crack and with distributing in excess of fifty grams of crack. Betts pleaded guilty to the distribution charge, admitting that he sold a substance containing cocaine base but stating that, for sentencing purposes, he disputed the allegation that the substance was crack. The government later dismissed the conspiracy charge without prejudice.

At sentencing the government presented two witnesses in support of its contention that the substance was crack. A forensic chemist with the Drug Enforcement Administration ("DEA"), Nicole Wenzel, testified that she analyzed the chemical composition of the substances contained in the two plastic bags. The first bag contained a paste-like substance, and the other contained a wet, off-white, rock-like substance. Wenzel's testing showed that the substance in the first bag was cocaine base and procaine, a local anesthetic that is used as an adulterant because it has physiological effects similar to cocaine. The substance in the second bag was made up of cocaine base, cocaine, and sodium bicarbonate. Asked to explain the difference between cocaine hydrochloride (powder cocaine) and cocaine base, Wenzel testified that cocaine hydrochloride has chloride salts attached to the cocaine molecule, while cocaine base has no salt attached. In her testing, Wenzel sought only to determine the presence of cocaine base and did not conclude whether either substance was crack.

Sergeant Kimble, an eighteen-year veteran of the Chicago Police Department with eight years as an under-

cover officer specializing in the investigation of narcotics trafficking, testified that he had purchased crack in an undercover capacity more than one hundred times and is familiar with the look, smell, and feel of crack. Sergeant Kimble testified that he called Person, asking for a half-kilo of crack, and in response, Betts and Person sold him two large chunks of a white, rocky substance. Based on his years of experience in narcotics, and by seeing, feeling, and smelling the substance, Sergeant Kimble concluded that it was crack.

To counter this evidence, the defense called an expert witness, Wayne Morris, a forensic scientist who had worked in law enforcement chemically analyzing thousands of drug samples. Morris testified that he was familiar with the traditional method of creating crack, and based on the procedure Betts described to him in an earlier interview, Morris concluded that the substance Betts created was not crack, but a non-crack form of cocaine base. Morris based this conclusion on Betts's statements that he used only a small amount of water and did not filter the substance, and that he had used the procaine and sodium bicarbonate to simply "blow up" or bulk up the product to "rip off" his customers.

Betts also testified, explaining that he and another codefendant, Antwan Ramsey, created the substance by taking a small amount of powder cocaine and adding an equal amount of procaine and sodium bicarbonate to bulk it up. They added a small amount of water, heated the mixture in the microwave for twenty to thirty seconds, and did not decant the resulting product. He

testified that he sold the half-kilo to Person for $5,000 below the market price for crack (although Sergeant Kimble paid full market price) and stated that his customers had complained about the quality of his product, which he held out to be crack.

In rebuttal, the government introduced the testimony of FBI Agent Jeffrey Moore, who participated in a proffer interview with Betts in May 2007. Agent Moore testified that in that interview, Betts explained that he and Ramsey had learned of a buyer who was seeking half a kilogram of crack. They therefore purchased powder cocaine and cooked it to prepare the crack. During the interview, Betts admitted that the facts contained in the criminal complaint and supporting affidavit, which described the transaction and included numerous references to "crack," were true and accurate. Agent Moore testified that it is his practice to clarify whether an interview subject is speaking about crack or powder cocaine, and that he had understood Betts as referring to crack throughout the interview. In his notes, Agent Moore noted the word "crack" as well as street terms for crack, including "hard cocaine," "rock cocaine," and "cooked."

At the conclusion of the testimony, the district court ruled that the substance at issue was crack, and, therefore, the ten-year statutory minimum sentence applied. *See* 21 U.S.C. § 841(b)(1)(A)(iii). In making its ruling the court specifically noted the testimony of Sergeant Kimble, stating, "there is nothing in that evidence that was submitted that would suggest that it is anything other

than what the undercover agent testified that it was. He testified by sight, smell, and by feel that it appeared to be crack. That is sufficient." The court then applied the relevant sentencing guideline for crack, *see* U.S.S.G. § 2D1.1, and sentenced Betts to 140 months' imprisonment, the bottom of the applicable guidelines range. This appeal followed.

## II. ANALYSIS

On appeal Betts challenges the district court's finding that the substance he sold was crack because, he argues, the government's evidence is insufficient to show that the substance was anything more than cocaine base. Additionally, Betts takes issue with two of the judge's statements, which, he contends, show that the judge not only relied on evidence outside the record but failed to understand the legal distinction between crack and cocaine base.

### A. The drug-type finding was not clearly erroneous.

At sentencing the government has the burden to prove drug type by a preponderance of the evidence. *United States v. Stephenson*, 557 F.3d 449, 452 (7th Cir. 2009). We review the district court's factual finding that the substance was crack under the deferential standard of clear error, and will reverse "only if we are left with the definite and firm conviction that a mistake was made." *United States v. Padilla*, 520 F.3d 766, 769 (7th Cir. 2008).

Crack is just one type of cocaine base, *see United States v. Booker*, 70 F.3d 488, 490-92 (7th Cir. 1995), and the enhanced statutory minimum sentence for the distribution of fifty grams or more of "cocaine base," 21 U.S.C. § 841(b)(1)(A)(iii), applies only to crack, *United States v. Edwards*, 397 F.3d 570, 571-72 (7th Cir. 2005). Similarly, the enhanced penalties contained in the sentencing guidelines use the term "cocaine base," but expressly apply only to crack. *See* U.S.S.G. § 2D1.1(c), Note D; *United States v. Bryant*, 557 F.3d 489, 498 (7th Cir. 2009). In light of the disparity between sentences for crack and other forms of cocaine base, it is critical that the government present evidence to show that the substance was crack and not merely cocaine base. *Padilla*, 520 F.3d at 771; *Edwards*, 397 F.3d at 571-72.

The difficulty, however, is that there is no precise chemical definition of crack, *Bryant*, 557 F.3d at 498, and in the guidelines, "crack" is described only as "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form," U.S.S.G. § 2D1.1(c), Note D. Consequently, in determining whether a substance is crack, courts have relied on a number of factors such as whether the substance has tested positive for the presence of cocaine base; the color, shape, and texture; the method of packaging; the price; and whether the seller represents the substance as or understands the substance to be crack. *Bryant*, 557 F.3d at 499-500 (quotations and footnotes omitted).

Here, the district court primarily relied on the observations and opinion of Sergeant Kimble, a veteran police officer with years of experience in narcotics investigations, to determine that the substance was crack. That finding is supported by the chemical analysis showing that the substance in each bag contained cocaine base as well as either sodium bicarbonate, commonly used in the production of crack, *see* U.S.S.G. § 2D1.1(c), Note D; *Padilla*, 520 F.3d at 770; or procaine, which, as the forensic chemist's testimony supports, is a common additive found in crack, *see also United States v. Snow*, 462 F.3d 55, 60 n.1 (2d Cir. 2006). Additionally, Agent Moore's understanding that Betts was referring to crack based on his repeated use of street terms for crack, as well as Betts's own statements that his customers came to him for crack and that the facts in the complaint were true and correct, further support the court's finding.

Betts takes issue with the district court's reliance on Sergeant Kimble's conclusion that the substance was crack because on cross-examination the sergeant acknowledged that he did not know how the substance was produced. Additionally, Sergeant Kimble was never asked whether he is able to distinguish between crack and other forms of cocaine base. We have repeatedly held, however, that a district court may rely on the testimony of people familiar with crack to determine that the substance was crack—"as those who buy and sell in the market generally understand the term." *Stephenson*, 557 F.3d at 453. Experts in this area may include veteran police officers, forensic chemists, drug users, and drug dealers.

*Id.*; *United State v. Lake*, 500 F.3d 629, 634 (7th Cir. 2007); *United States v. Bradley*, 165 F.3d 594, 596 (7th Cir. 1999). The court was therefore allowed to rely on Sergeant Kimble's testimony that he believed, based on the look, smell, and feel of the substance, that it was crack.

Betts next argues that the unrefuted testimony of his expert witness shows that the method he used to produce the substance lacked the hallmarks of traditional crack production: the use of large amounts of water, dissolution, and a final decantation or filtration process. We have refused to adopt a rigid definition of crack or to recognize one specific method for producing crack because to do so "would invite those in the drug trade to make minor changes in structure, processing, or packaging to avoid the increased penalties for selling crack cocaine." *Stephenson*, 557 F.3d at 453; *see Bryant*, 557 F.3d at 499; *United States v. Abdul*, 122 F.3d 477, 479 (7th Cir. 1997). Moreover, the district court discounted the testimony of Betts's expert witness based on the fact that the expert relied on Betts's own description of how he made the substance and, the court concluded, Betts's account of that procedure was not consistent with the chemical analysis, which showed that the substance had been converted to cocaine base.

## B.  Judge's comments did not amount to reversible error.

Betts next contends that two of the judge's comments at sentencing constitute reversible error. Betts argues that the court improperly relied on evidence outside the record to discount the testimony of Betts and his expert

witness, citing the judge's statement that, "[i]n the many cases that I've had where experts have testified about crack cocaine, Mr. Betts' testimony . . . about how this was produced would be absolutely inconsistent with the process yielding cocaine base." The judge went on to explain that if Betts had used only a small amount of water and did not pour it out, the substance would simply be powder cocaine mixed with sodium bicarbonate, "and that's not the clinical analysis of the substance." Therefore, the judge concluded, "it didn't happen the way Mr. Betts testified."

A sentencing court has wide latitude in the types of evidence it may consider, *Padilla*, 520 F.3d at 769, so long as that evidence bears sufficient indicia of reliability, *see* U.S.S.G. § 6A1.3(a). Although the rules of evidence and the right to confront witnesses do not apply at sentencing, *see Williams v. New York*, 337 U.S. 241, 250-51 (1949); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005), the court is generally prohibited from relying on undisclosed evidence as this deprives the parties of the opportunity to rebut or respond to the evidence, *see Burns v. United States*, 501 U.S. 129, 135 (1991) (explaining that Federal Rule of Criminal Procedure 32 "contemplates full adversary testing of the issues relevant to a Guidelines sentence"); *United States v. Christman*, 509 F.3d 299, 304-05 (6th Cir. 2007). Indeed, it is unclear which experts the judge was referring to, or if, as the government suggests, the judge was referring to his knowledge of undisputed scientific facts about the process of creating cocaine base, detailed in our prior opinions, *see, e.g., United States v. Kelly*, 519 F.3d 355, 359

(7th Cir. 2008); *Edwards*, 397 F.3d at 574; *Booker*, 70 F.3d at 490-91 (taking judicial notice of the chemical properties of cocaine and cocaine base as well as the conversion process). Nevertheless, the court's statement does not constitute reversible error. The parties had a full opportunity to present evidence on this issue, and the court adequately explained its reasoning for the conclusion that Betts's description of how he produced the cocaine base was not credible. A district court's determination of credibility is entitled to great deference, *United States v. Longstreet*, 567 F.3d 911, 925 (7th Cir. 2009), and even if we disregard the court's reference to expert testimony from other cases, sufficient evidence supports the court's credibility determination, and it was not clearly erroneous.

Finally, Betts highlights the judge's comment that "[t]here is no dispute that on the other side of the process it yielded cocaine base, so I'm at a loss to understand why we went through this exercise." Betts is correct that a conversion to cocaine base does not necessarily create crack, *see Stephenson*, 557 F.3d at 453 (noting that other methods of converting powder cocaine may result in non-crack cocaine base, including "freebase cocaine"); *Booker*, 70 F.3d at 491 (same); *Bradley*, 165 F.3d at 596 (distinguishing "coca paste" and "other exotic form[s] of cocaine base" from crack), and the evidence presented at sentencing was important given the significant sentencing disparity between crack and other forms of cocaine base, the latter of which are sentenced in the same manner as powder cocaine, *see Padilla*, 520 F.3d at 771. But a reading of the ruling as a whole shows that

the judge understood crack to be just one form of cocaine base. As the judge commented, "[c]rack is merely a physical form of cocaine base that's smokable." Moreover, the court permissibly relied on Sergeant Kimble's opinion that the substance was crack. The court's determination that none of the other evidence submitted "would suggest that it is anything other than what the undercover agent testified that it was," reflects that the court considered the remaining evidence, and we cannot say that this finding was clearly erroneous. Although the government's evidence provided little to specifically distinguish the substance from other forms of cocaine base, it needed to show only "more likely than not" that the substance was crack, *United States v. Branch*, 195 F.3d 928, 934 (7th Cir. 1999). And here the totality of the evidence—including the chemical analysis showing cocaine base, the undercover officer's opinion that the substance was crack, and Betts's own use of street terms for crack in the proffer interview as well as his statements that he purported to sell crack and that the criminal complaint alleging that he sold "crack" was correct—supports the court's finding.

## III.  CONCLUSION

Accordingly, we AFFIRM Betts's sentence.