In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 06-1808

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VERNELL KELLY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 05 CR 269—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED APRIL 2, 2007—DECIDED MARCH 10, 2008

———————

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted of Vernell Kelly
of knowingly possessing a firearm following a felony
conviction, in violation of 18 U.S.C. § 922(g)(1), and know-
ingly and intentionally possessing, with the intent to
distribute, crack cocaine, in violation of 21 U.S.C.
§ 841(a)(1). The district court ordered him to serve a
prison term of 235 months. Kelly appeals, contending
that the evidence was insufficient to establish his posses-
sion of both the firearm and the cocaine underlying one
of the two narcotics charges against him, that the evid-
ence did not adequately establish that the cocaine attrib-

uted to him took the form of crack cocaine, and that the district court improperly characterized him as a career offender for sentencing purposes. We affirm.

**I.**

A tip brought Chicago police officers to the corner of Homan and Carroll Streets on Chicago's west side, where the officers were told defendant-appellant Kelly was distributing crack cocaine. Shortly before midnight on the night of June 16, 2004, undercover officer Patrick Thelen observed what appeared to be a drug transaction. Kelly pulled up to the scene in a van and exited the vehicle. Another man approached Kelly, conversed with him briefly, and then handed him money. Kelly then removed a golf-ball sized object from a plastic bag in the back of his pants, handed the object to the other man, and put the plastic bag back into his pants. The other man walked away. Thelen radioed his fellow officers, who were parked a short distance away, to move in on Kelly. As Thelen himself began to approach Kelly, he saw Kelly remove the plastic bag from his pants and drop it to the ground. Officer Mireya Lipsey retrieved the bag and discovered that it contained another golf ball-sized object, which turned out to be twenty small packets each containing a white, chunk-like substance that she suspected was crack cocaine. The twenty bags had blue stars on them. Kelly was placed under arrest and advised of his rights. A search of his van produced no additional contraband.

A set of keys for a basement apartment at 3309 West Warren in Chicago was discovered on Kelly's person. According to the police, Kelly identified 3309 West

Warren as his address. The police proceeded to that apartment to continue their investigation.

Shortly after midnight, the arresting officers called at 3309 West Warren. Betsy Washington answered the door to the basement apartment. Washington is the mother of Kelly's daughter. Washington and their daughter resided in the apartment along with Zippora Collins and her daughter. The police solicited and received Washington's written consent to search the apartment.

The apartment contained three bedrooms. Collins would later testify that she and her daughter occupied two of the bedrooms and that Washington and her daughter occupied the third. According to Collins, she saw Kelly at the apartment three to four times per week in June of 2004. She would only see Kelly in the mornings, because Collins typically arrived home at a late hour when everyone else in the apartment was asleep.

In the bedroom occupied by Washington and her daughter, Thelen discovered a .45-caliber semiautomatic Ruger firearm loaded with hollow-point ammunition. In the same room, Lipsey discovered three pieces of mail addressed to Kelly at the Warren Street address. Among them was a letter to Kelly from the Social Security Administration dated June 10, 2004—six days prior to Kelly's arrest.

In addition to the gun, the officers also retrieved cocaine from the apartment. In a utility closet, Officer Brian Spain discovered a large plastic bag containing nine smaller plastic bags, each of which in turn contained thirteen mini Ziploc bags, for a total of 117 bags. Each of the mini Ziploc bags contained a white, rock-like substance that appeared to be crack cocaine. Each of the mini bags was

also marked with blue stars like those found on the bags that Kelly had dropped at Homan and Carroll.

Spain would later testify that mini Ziploc bags are commonly used by narcotics traffickers on Chicago's west side. He also indicated that he had seen a number of such bags with various types of markings (for example, blue devils and red boats) on them. However, he had never before seen bags marked with blue stars.

Their search of the Warren Street apartment complete, officers returned to the police station to question Kelly. Kelly was again advised of *Miranda* rights. When shown the gun and the cocaine that had been discovered in the apartment, Kelly remarked that "my baby's mama don't know nothing about my gun and the rocks," or words to that effect—although Thelen was certain that he used the term "rocks." R. 85-7 at 135-36, 213. Kelly indicated that he had obtained the gun from a friend and that he kept it for his protection.

A grand jury subsequently returned a three-count indictment against Kelly. Count One charged Kelly with knowingly possessing a firearm in or affecting interstate commerce following a conviction for a felony. *See* 18 U.S.C. § 922(g)(1). Counts Two and Three charged Kelly with possessing more than five grams of a substance containing cocaine base in violation of 21 U.S.C. 841(a)(1). Count Two involved the cocaine recovered at the scene of Kelly's arrest at Homan and Carroll Streets. Count Three involved the cocaine recovered from the Warren Street apartment.

Prior to trial, Kelly moved unsuccessfully to suppress all of the physical evidence obtained from both the scene of the arrest and the apartment at 3309 West Warren. Kelly

argued that his detention and seizure at the arrest scene was contrary to the Fourth Amendment. He testified, contrary to the arresting officers, that he had not engaged in any drug transaction and had not dropped a plastic bag to the ground before he was detained. Instead, Kelly asserted that as he parked his van and got out to patronize a nearby liquor store, the officers stopped him, ordered him onto the ground, handcuffed him, and searched him and then the van. Although Kelly did agree that he had cocaine in his possession—specifically, a "20-pack" of cocaine—he testified that it was in the van rather than in the plastic bag that officers testified he had dropped to the ground. Because the officers lacked a basis on which to stop him and engage in the search, Kelly argued, the cocaine seized from his van along with the gun and cocaine found at the 3309 West Warren apartment all should be suppressed pursuant to the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484-85, 487-88, 83 S. Ct. 407, 416, 417 (1963). The district court denied Kelly's motion, observing that the merits of the motion depended on whose version of events the court was to credit (Kelly's or that of the two officers who testified), and the court found the government's evidence to be more credible. R. 27.

As noted, Counts Two and Three of the indictment charged Kelly with possessing, with the intent to distribute, more than five grams of a mixture containing cocaine base in the form of crack cocaine. R. 5 at 2, 3. Although the quantity and particular type of controlled substance are not elements of the crime prohibited by 21 U.S.C. § 841, *e.g.*, *United States v. Martinez*, 301 F.3d 860, 865 (7th Cir. 2002), they do have an important effect on the statutory range of punishment to which the defendant is exposed.

Possessing with the intent to distribute a detectable amount of any schedule II controlled substance is punishable by a prison term of 0 to 20 years, § 841(b)(1)(C), whereas possessing more than five grams of a mixture or substance containing cocaine base in the form of crack cocaine exposes the defendant to 5 to 40 years in prison, § 841(b)(1)(B)(iii). The two most common types of cocaine found in the United States are cocaine hydrochloride, which typically takes the form of a white powder and is water soluble, and crack cocaine, a form of cocaine base that typically takes a chunky, rock-like form and is not water soluble. Cocaine hydrochloride can be converted to cocaine base by dissolving it in water, bringing it to a boil, and then adding a base—usually sodium bicarbonate. Sodium bicarbonate reacts with the hydrochloride to form table salt, freeing the cocaine base, which eventually settles to bottom of the liquid. When the liquid is poured off, what is left is cocaine base in a solid form typically referred to as "crack." *See* R. 85-8 at 282-84; *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005); *United States v. Booker*, 70 F.3d 488, 490-91 (7th Cir. 1995). Cocaine base can take other forms, so although all crack is cocaine base, not all cocaine base is crack. *Edwards*, 397 F.3d at 571.

DEA forensic chemist Anthony Harris testified at Kelly's trial that the substances found at both the scene of Kelly's arrest, at Homan and Carrol Streets, and at the apartment at 3309 West Warren chemically were cocaine base. Exhibit 5, the cocaine retrieved from the scene of Kelly's arrest, had a purity of 90 percent. Exhibit 6, the cocaine found at 3309 West Warren, had a purity of 81 percent. No sodium bicarbonate was found in either exhibit, but Harris testified it was possible that the bicarbonate had been removed in the process of pouring off

the liquid; it was also possible that another base had been used to convert the powder cocaine into crack.

FBI Special Agent Michael Culloton, who worked as part of a task force investigating drugs and street gangs, and whom the court recognized as an expert in the identification and packaging of crack cocaine, opined that Exhibit 6, the cocaine recovered from the Warren Street apartment, was crack cocaine. He noted that it was off-white in color, had a rock-like appearance and texture, and was packaged in small quantities in small Ziploc bags consistent with the way in which crack cocaine is typically sold on the street. The blue stars on the bags were consistent with the sorts of markings that cocaine dealers use to differentiate their products. Also, according to a police report, Kelly had referred to the substance retrieved from 3309 West Warren as "rock" and that is a street term used to refer to crack cocaine.

Exhibit 5, the cocaine recovered from the scene of Kelly's arrest, had been entirely ground up for testing without first being photographed, so Culloton could not testify based on observation of the remainder whether the cocaine was, in fact, crack cocaine. Culloton did testify that if the substance had the same physical characteristics as Exhibit 6, he would conclude it was crack cocaine. One reason factoring into his opinion was that the mini Ziploc bags in which the cocaine recovered from the arrest scene had been packaged were consistent with 20 individual user-sized quantities of crack cocaine for sale.

Kelly took the witness stand in his own defense. Kelly acknowledged that he was a regular user of narcotics, and he admitted that he was in possession of a twenty-pack of cocaine on the evening of his arrest, but he denied that he was distributing cocaine. Consistent with the account

he gave at the pre-trial suppression hearing, Kelly testi-
fied that on the night of June 16, 2004, he had just arrived
at the intersection of Homan and Carroll Streets and was
alighting from his minivan in order to enter a nearby
grocery and liquor store. Suddenly, police cars pulled up,
he was ordered onto the ground, handcuffed, and placed
in a squad car. Kelly denied that he had conducted any
type of narcotics transaction before the police officers
seized him. The twenty-pack of cocaine was found in
the van, he insisted; only his keys and his wallet were
on his person at the time of the arrest. Kelly also denied
that the gun and the cocaine found at the Warren Street
apartment were his, and he denied ever telling the police
that they were his. Although Kelly acknowledged that he
visited the Warren Street apartment daily in order to pick
up his daughter and take her to a babysitter, and also
that he had plans to meet Washington there later that
same evening, he denied that he lived or slept at that
apartment. He indicated that he had his own residence
elsewhere. He explained that he had his Social Security
disability check sent to the Warren Street apartment
because he provided child support to Washington from
that check and previously one of his checks had been
stolen. The two other pieces of mail addressed to Kelly
that had been found at the apartment were bills for a
cellular telephone, and he indicated that the bill was
sent to the Warren Street address because the phone was
one that Washington used and for which she paid.

The jury found Kelly guilty on all three counts of the
indictment. R. 40. As to the narcotics charges set forth
in Counts Two and Three, the jury returned a special
verdict form indicating that the substance Kelly had
possessed in each instance amounted to at least five but

less than 50 grams of cocaine base in the form of crack cocaine. R. 41.

Kelly subsequently moved for a judgment of acquittal or, in the alternative, a new trial. He asserted that the government had failed to prove that he possessed the cocaine and gun found at the Warren Street apartment. He also argued that the government had not adequately shown that the cocaine found at either the apartment or at the scene of his arrest was crack cocaine as opposed to some other form of cocaine base. The district court denied his motions without comment. R. 45.

In advance of sentencing, the probation officer prepared a Pre-Sentence Report ("PSR") which, among other things, categorized Kelly as a career offender. *See* U.S.S.G. § 4B1.1. The probation officer's finding in that regard was based on two prior felony convictions, both for the possession of a controlled substance with the intent to deliver. Although Kelly objected to other aspects of the PSR, he raised no objection to the determination that his prior convictions rendered him a career offender. R. 52. The career offender designation turned out to have made no difference in Kelly's offense level, but it did raise his criminal history category from IV to VI, and boosted the advisory Guidelines sentence on the narcotics counts from a range of 210 to 262 months to 262 to 327 months.

The district court ordered Kelly to serve a sentence of 120 months (the statutory maximum) on Count One (the firearm charge), and concurrent terms of 235 months on Counts Two and Three. Kelly's total sentence of 235 months was thus 27 months below the bottom end of the advisory Guidelines range.

**II.**

**A.**

Kelly first challenges the sufficiency of the evidence to support the notion that he possessed the firearm and cocaine found at 3309 West Warren.[1] As Kelly acknowledges, possession can be constructive rather than actual. *E.g.*, *United States v. Bustamante*, 493 F.3d 879, 889 (7th Cir. 2007), *cert. denied,* 2008 WL 261128 (U.S. Feb. 25, 2008). Constructive possession exists when, although the object is not in the defendant's actual possession, he knowingly has the power and intention at a given time to exercise dominion and control over the object. *Id.* Of course, possession can be shown through circumstantial as well as direct evidence. *United States v. Gilbert*, 391 F.3d 882, 886 (7th Cir. 2004). We previously have sustained convictions for the possession of contraband found in a defendant's home, *Bustamante,* 493 F.3d at 889, or at his girlfriend's home, *United States v. Wilson*, 922 F.2d 1336, 1339 (7th Cir. 1991).

---

[1] Relatedly, Kelly argues that the district court should have suppressed or excluded evidence of the items found at the Warren Stret apartment because there was insufficient evidence to establish, even as a threshold matter, that he constructively possessed those items. This was not an argument that he made below in support of his motion to suppress or at trial. He therefore forfeited this argument, confining our review to one for plain error alone. *United States v. Haskins*, 511 F.3d 688, 694 (7th Cir. 2007). For the same reasons that we find the evidence sufficient to support his conviction for possessing the firearm and the cocaine found at 3309 West Warren, we find no plain error in the admission of evidence concerning the gun and the cocaine.

In Kelly's view, the evidence was insufficient to demonstrate that either the gun or cocaine were under his control. He points out that neither the firearm nor the ammunition had his fingerprints on them. There was no evidence that the gun was found among his personal belongings. There is no dispute that he had a set of keys to the apartment on his person at the time of his arrest and that he frequented the apartment (he regularly picked up his daughter from the apartment and took her to her maternal grandmother to watch), and Kelly admits that he received some mail there. But, he adds, the record is devoid of indicia (e.g., the presence of his toiletries) that he actually lived at the apartment, such that the inference of possession could be drawn more easily. He denies having referred to the pistol as his.[2] As to the cocaine, he makes the same arguments, and adds that there is no evidence that the baggies in which the cocaine was packaged were identical to those found at the scene of his arrest, or that the cocaine found at the apartment had the same purity and chemical signature as that discovered at the arrest scene. On the contrary, the testimony revealed that they had different purities.

---

[2] Kelly suggests that the testimony concerning his alleged statement should not have been allowed "because it created an improper nexus between Mr. Kelly and the items seized." Kelly Amended Br. 13. We discern no error in the admission of this testimony, however. If, as the government's evidence indicated, Kelly freely made this statement after being apprised of his *Miranda* rights, his statement was both admissible and probative. Whether he in fact made the statement presented a straightforward credibility question for the jury. *E.g.,* *United States v. Earnest*, 129 F.3d 906, 912-13 (7th Cir. 1997).

The evidence is sufficient to support the jury's finding that Kelly possessed the cocaine and pistol found at the apartment. We are, of course, obliged to view the evidence in a light most favorable to the government and to sustain the jury's finding so long as any rational factfinder could have made the same determination. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). As Kelly concedes, he had access to and frequented the Warren Street apartment. Indeed, he not only had keys to the apartment in his possession when he was arrested, but he gave the Warren Street address as his own address to the arresting officers. The gun was found in the room occupied by his daughter and her mother. Mail addressed to Kelly was found in that same room. The cocaine was found elsewhere in the apartment, but it was packaged similarly to that found at the scene of the arrest, with the baggies bearing the same blue stars as those which marked the baggies found at the scene of the arrest. The fact that the cocaine found in the apartment had a different purity than the cocaine discovered at Homan and Carrol Streets is beside the point, given the abundant other evidence linking the cocaine to Kelly. Standing out most prominently among that evidence is the testimony that when confronted with the discovery of the gun and the cocaine, Kelly referred to the gun and "the rocks" as his and told the police that Washington knew nothing about them. Kelly also told the officers that he kept the gun for protection. At trial, Kelly denied making these statements, but the jury was entitled to credit the police testimony over his own denial. Given Kelly's substantial ties to the apartment and his own statement that the firearm and the "rocks" were his and not Washington's, the evidence was more than sufficient to support the

jury's finding that Kelly possessed both the firearm and the cocaine.

**B.**

As we have noted, the jury in rendering its verdict specifically found as to both Counts Two and Three that Kelly possessed at least five but less than 50 grams of cocaine base in the form of crack cocaine. As we have noted, possession of that quantity of crack cocaine elevates the statutory minimum prison term from zero to five years and the statutory maximum term from twenty to forty years. *Compare* 21 U.S.C. § 841(b)(1)(C) *with* § 841(b)(1)(B)(iii). Kelly argues that the district court erroneously denied his post-trial motions for a new trial or for entry of a judgment of acquittal as to Counts Two and Three, because, in his view, the evidence was insufficient to prove that the cocaine he possessed was crack cocaine. But in this respect Kelly misapprehends the significance of the determination that he possessed a particular quantity of crack cocaine. The particular type and amount of cocaine that a defendant possesses are not elements of the section 841 offense. *See*, *e.g.*, *United States v. Gougis*, 432 F.3d 735, 745 (7th Cir. 2005); *Knox v. United States*, 400 F.3d 519, 523 (7th Cir. 2005). So long as Kelly possessed, with the appropriate mental state, a detectable amount of a substance or mixture containing cocaine base—and Kelly does not dispute that he possessed some form of cocaine base—then he is guilty of violating section 841. *Id.* Under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000) and its progeny, the relevance of the drug type and quantity determinations lies in their effect on the sentence: because they increase the

statutory maximum prison term[3] to which the defendant is exposed, the jury must make these findings beyond a reasonable doubt. *E.g.*, *United States v. Flagg*, 481 F.3d 946, 949-50 (7th Cir.), *cert. denied*, 128 S. Ct. 193 (2007). Consequently, the remedy for a failure of proof that a defendant possessed a particular amount or type of cocaine would not be to grant him a judgment of acquittal or a new trial, but rather to remand for re-sentencing subject to the default statutory maximum term of twenty years. *See*, *e.g.*, *United States v. Noble*, 246 F.3d 946, 955-56 (7th Cir. 2001). Of course, the sentence that the district court ordered Kelly to serve—235 months—is already below that maximum. Consequently, *Apprendi* is not implicated. *See United States v. Hernandez*, 330 F.3d 964, 980-81 & n.11 (7th Cir. 2003) (coll. cases). We shall nonetheless assume that, if the evidence as to type and quantity of cocaine he possessed were indeed lacking, Kelly might at least have a case to make for a limited remand for the district court to consider whether it was inclined to re-sentence Kelly. The district court selected the 235-month term with reference to a Guidelines range that was entirely above the default twenty-year maximum, and theoretically the court might have chosen an even lower sentence had it known that twenty years was the most that it could impose. *Cf. United States v. Della Rose*, 403 F.3d 891, 907 (7th Cir. 2005) (where district judge sentenced defendant at top of Guidelines range believing that his discretion was confined to that range, it was

---

[3] The finding that Kelly possessed at least five but less than 50 grams of crack cocaine triggered a statutory minimum prison term of five years, but statutory minimum terms do not implicate *Apprendi*. *Harris v. United States*, 536 U.S. 545, 122 S. Ct. 2406 (2002).

possible judge might have sentenced defendant differently knowing that he was free to impose a sentence outside of that range) (citing *United States v. Paladino*, 401 F.3d 471, 482 (7th Cir. 2005)). However, having reviewed the trial record, we conclude that the evidence was adequate to support the jury's finding.

As we noted above, crack cocaine is one form of cocaine base. As a base, crack is distinguishable chemically from the acid form of cocaine, cocaine hydrochloride, which usually takes the form of a powder. *See United States v. Morris*, 498 F.3d 634, 642 (7th Cir. 2007), *petition for cert. filed* (U.S. Feb. 22, 2008) (No. 07-1094); *United States v. Edwards*, *supra*, 397 F.3d at 574. But it is not chemically distinguishable from other forms of cocaine base or from cocaine in its natural state. *See id.* (citing *United States v. Booker*, *supra*, 70 F.3d at 490). "Crack" is a street term (R. 85-8 at 284-85), and what serves to differentiate crack cocaine from other forms of cocaine base are its form and color as well as the way in which it is typically packaged for distribution on the street. *See Morris*, 498 F.3d at 642; *Edwards*, 397 F.3d at 572-73; *see also, e.g., United States v. Johnson*, 437 F.3d 69, 75 (D.C. Cir. 2006); *United States v. Waters*, 313 F.3d 151, 156 (3d Cir. 2002); *United States v. Dent*, 149 F.3d 180, 190 (3d Cir. 1998). Crack cocaine typically assumes a lumpy, rock-like form and has an off-white or yellowish cast. U.S.S.G. § 2D1.1(c), Note D; *Edwards*, 397 F.3d at 372-73. Individual bits or "rocks" of crack cocaine commonly are packaged in small plastic bags for distribution at the street level. *See* R. 85-7 at 210-11; R. 85-8 at 304; *e.g., Morris*, 498 F.3d at 642; *United States v. Griffin*, 194 F.3d 808, 817 (7th Cir. 1999).

DEA chemist Harris analyzed the chemical composition of the cocaine found at the scene of Kelly's arrest and at the Warren Street apartment and testified that in

both instances it was cocaine base. Harris acknowledged that no traces of sodium bicarbonate were discovered in either instance. But this did not rule out the possibility that the substance constituted crack cocaine. As Harris testified, sodium bicarbonate is not the only base that can be used to convert cocaine hydrochloride into crack cocaine. Moreover, even when sodium bicarbonate is used, because it is water soluble it is possible for all remnants of it to be disposed of when the liquid is poured off at the conclusion of the conversion process.

As to the cocaine base found at the Warren Street apartment, Special Agent Culloton's testimony supplied an ample basis for the jury to conclude that this was crack cocaine. What remained of this cocaine after testing had been preserved in the same form in which it had been discovered, and as set forth above, Culloton testified based on his experience that the substance looked like crack cocaine: it had an off-white color and a rock-like appearance and texture. Moreover, the cocaine was packaged in a manner consistent with the sale of individual user quantities, and the blue stars on the mini Ziploc bags were consistent with the markings cocaine dealers used to brand their products. Finally, as Culloton pointed out, Kelly himself had referred to the cocaine as "rock" or "rocks," which is a street term commonly used in reference to crack cocaine. *See United States v. Earnest*, 185 F.3d 808, 812 (7th Cir. 1999) (sellers and buyers of crack cocaine are experts in what constitutes crack).

The evidence as to the cocaine base recovered from the scene of Kelly's arrest is less complete, because none of that cocaine was preserved in the same form in which it had been discovered nor was it photographed before it was ground up for testing. Consequently, the most that Culloton could say was that if the cocaine base had the

same appearance as that found in the Warren Street apartment, he would surmise that it was crack cocaine. He also said that the packaging of the cocaine was consistent with individual-user quantities.

Still, we view the evidence as sufficient to support the jury's finding that this too was crack cocaine. The trial testimony established that the cocaine was in a rock form before it was ground up for testing. R. 85-7 at 181; R. 85-8 at 275. The cocaine was packaged in the same manner as the cocaine found at the Warren Street apartment, and the small Ziploc baggies in which the cocaine was packaged bore the same blue stars as the baggies used to package the cocaine found at the apartment. As the substance was packaged in the same way, and in comparable user-sized quantities, as the crack cocaine found at the Warren Street apartment, it is a rational inference that this cocaine base was crack cocaine. Finally, although Kelly's counsel attempted to suggest that the cocaine might have been in paste form (which, like crack, can be smoked and is smoked in the Andes, *see United States v. Brisbane*, 367 F.3d 910, 911 (D.C. Cir. 2004)), the testimony establishes that this is quite unlikely: DEA forensic chemist Harris testified that he had never seen coca paste in his seven-plus years as a forensic chemist (R. 85-8 at 291) and that the high level of purity of the cocaine he tested in this case was inconsistent with it being coca paste (R. 85-8 at 296); and Officer Lipsey testified that in her five years of narcotics surveillance on Chicago's west side, she had never come into contact with coca paste nor heard of it being distributed (R. 85-7 at 196).[4]

---

[4] At one point in his testimony, Culloton, noting that the laboratory report regarding Exhibit 6 (the cocaine found at the

(continued...)

## C.

Finally, Kelly contends that he was improperly desig-
nated a career offender for sentencing purposes. Section
4B1.1(a) of the Guidelines provides that a defendant is a
career offender if (1) he was at least eighteen years old
when he committed the offense of conviction, (2) the
offense of conviction is a felony that qualifies as either
a crime of violence or a controlled substance offense,
and (3) the defendant has at least two prior felony con-
victions for either a crime of violence or a controlled
substance offense. The career offender designation in-
creases the advisory sentencing range by boosting a
defendant's criminal history category to VI (the highest
category) and by specifying a default offense level that in
many cases is higher than would otherwise apply. *See*
§ 4B1.1(b). In this case, as we have noted, Kelly's offense
level ultimately was not increased by the designation, but
his criminal history category was boosted by two levels.
Kelly concedes that he meets the first two criteria for the
career offender designation, and that he has one prior
felony conviction for a crime that qualifies as a con-
trolled substance offense. However, he contends that the
record does not support the district court's conclusion

---

[4] (...continued)
Warren Street apartment) indicated that the substance contained
cocaine base, remarked that "[c]ocaine base is a form of crack
cocaine." R. 85-8 at 307. That was erroneous; although crack is a
form of cocaine base, not all cocaine base is crack. *Edwards*, 397
F.3d at 571. Kelly suggests that Culloton's misstatement may
have misled the jury, but we view that as unlikely. Culloton
expressly acknowledged on cross-examination that not all
cocaine base is crack (R. 85-8 at 309), and the parties themselves
correctly recognized and argued that point throughout the case.

that he also has a second prior conviction for a controlled substance offense that suffices to put him in the career offender category. Specifically, he contends that the record before the district court did not make clear whether the second prior conviction was one for possessing a controlled substance with the intent to distribute, which would qualify as a controlled substance offense for purposes of section 4B1.1, or rather one for simple possession, which would not. *See* § 4B1.2(b) (defining "controlled substance offense" to mean a felony offense involving the manufacture, import, export, distribution or dispensing of a controlled substance or the possession of a controlled substance with the intent to manufacture, import, export, distribute, or dispense); *United States v. Atkinson*, 979 F.2d 1219, 1222 (7th Cir. 1992).

Our review is limited to one for plain error, as Kelly did not make this argument below, *e.g.*, *United States v. Haskins*, 511 F.3d 688, 694 (7th Cir. 2007), and no such error occurred here. The probation officer's pre-sentence report ("PSR") described the relevant prior conviction as one for possession of a controlled substance with intent to deliver, for which conviction Kelly was ordered to serve a prison term of three years. R. 82 at 9. So described, that conviction met the Guidelines' definition of a prior felony conviction for a controlled substance offense. Kelly argues that the record before the district court did not confirm the PSR's characterization of the prior conviction, because it did not include any of the documentation underlying that conviction and, as Kelly now points out, the three-year sentence he received was consistent with a conviction for simple possession of a controlled substance as well as a conviction for possession with the intent. But nothing on the face of the PSR gave reason to

question its accuracy, and in the absence of an objection, the district court was entitled to rely on its characterization of Kelly's prior conviction. *See* Fed. R. Crim. P. 32(i)(3)(A) (sentencing court "may accept any undisputed portion of the presentence report as a finding of fact . . ."); *e.g.*, *United States v. Sanchez*, 507 F.3d 532, 537 (7th Cir. 2007) (defendant bears burden of producing some evidence calling into question accuracy of PSR) (coll. cases). And, as it turns out, the PSR's characterization of the prior conviction was entirely accurate: Kelly's appellate counsel obtained a transcript of the 1997 hearing at which Kelly changed his plea to one of guilty, and that transcript makes clear that Kelly was pleading guilty not to simple possession of a controlled substance but rather possession with the intent to distribute. Appeal No. 06-1808, Doc. No. 30 (letter dated Nov. 6, 2006 from appellant's counsel, with attachment). That information forecloses the possibility that any error occurred which would warrant relief under the plain error standard. *See United States v. Nance*, 236 F.3d 820, 825-26 (7th Cir. 2000). Kelly's related argument, that his base offense level on the firearm charge was improperly calculated based on the mistaken notion that he had two prior convictions for a controlled substance offense, fails for the same reason.

## III.

For the foregoing reasons, we AFFIRM Kelly's conviction and sentence.