In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-4032 & 08-1469

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHARNEL PLUMMER AND DARRYL GRIFFIN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 638—**David H. Coar**, *Judge.*

ARGUED DECEMBER 10, 2008—DECIDED SEPTEMBER 4, 2009

Before POSNER, KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* On June 29, 2007, Sharnel Plummer and Darryl Griffin were convicted of conspiracy to possess with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 846, and distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and Griffin was also convicted of two additional counts of distribution of at least 5 grams of crack cocaine. The district court sentenced Plummer to 240 months' impris-

onment and 10 years' supervised release, and sentenced Griffin to 252 months' imprisonment and 10 years' supervised release. Both defendants appealed challenging the conviction and sentence, and we affirm.

In 2006, agents from the Drug Enforcement Agency ("DEA") in conjunction with the Chicago Police Department ("CPD") engaged in Operation Englewood aimed at combating the use of illegal narcotics in Chicago's Englewood neighborhood. As part of that operation, DEA agent Pointer and CPD undercover officer Miller (the "agents") went to a neighborhood gas station to seek contacts to obtain crack cocaine. There, they came into contact with Gene Brown and told him that they were seeking to purchase an eight ball of rock. The term eight ball refers to one-eighth of an ounce, and rock is a street term for crack cocaine. Brown got into their vehicle and directed them to another location. Brown then exited the vehicle and spoke with defendant Plummer who was in a white vehicle at that location. Plummer asked the agents whether they wanted more or less than an eight ball and the agents indicated that they wanted more. Plummer then gave his phone number to the agents and provided Brown with a sample of what appeared to be crack cocaine, which Brown retained.

Agent Miller later called Plummer and agreed to purchase a half ounce for $350. They met at a prearranged location and Plummer handed him a plastic bag, knotted in the corner, with a single chunk rock in the corner that was the size of a fifty cent piece and was an off-white

color. The rock-like substance later tested positive for the presence of cocaine base with a purity level of 54% as well as sodium bicarbonate (also known as baking soda). The process was repeated a few day later, with Miller purchasing an ounce of crack cocaine for $700. The drugs were similar in appearance to the previous purchase, and subsequent chemical analysis confirmed that it contained cocaine base with a purity of 63%, as well as procaine and sodium bicarbonate. The chemist testified that procaine is a noncontrolled substance used as a local anesthetic, also known by the trade name novocaine, which is commonly used as a filler in cocaine samples to increase the bulk of the sample so more of it can be sold.

Two days later, Miller again called Plummer, this time to set up a purchase for 2½ ounces of crack cocaine for a purchase price of $1,750. Plummer directed the agents to a house to complete that deal. When the agents arrived, Griffin rather than Plummer entered their car. The agents initially refused to deal with Griffin and ordered him out of the car. They spoke with Plummer by cell phone and observed him speak to Griffin in the doorway of a second-floor porch of the home. Ultimately, they agreed to deal with Griffin, who had identified himself as Plummer's uncle. They gave Griffin the $1,750 and he provided them with a knotted, twisted plastic bag containing a rock-like substance that was about the size of a golf ball. That substance tested positive as containing cocaine base of a purity of 60%, procaine, and sodium bicarbonate.

Griffin and Plummer raise a number of challenges to the conviction and sentence. Most of those challenges center on the identification of the substance involved as crack cocaine. They argue that the substance was not of sufficient purity to be crack cocaine for purposes of the statute. Specifically, the defendants contend that in increasing the sentence for crack cocaine, Congress was concerned with the highly addictive nature of crack cocaine because of its high purity. According to the defendants, cocaine base with a purity level less than 75-80% purity should not be considered crack cocaine under the statute because it does not present that same danger. They further assert that the statute is unconstitutionally vague if interpreted to include substances of lower purity. In addition, the defendants' attorneys at trial sought a jury instruction that would have distinguished crack cocaine from freebase cocaine, which is a smokeable form of cocaine that is made using ether. Unlike crack cocaine, freebase cocaine is highly flammable and is dangerous to produce. The defendants argue that it is indistinguishable in appearance to crack cocaine, and therefore that the district court erred in failing to instruct the jury regarding freebase cocaine and that the statute as applied is void for vagueness.

The defendants have no support for their purity argument other than reference to legislative history expounding on the dangers of crack cocaine and its highly addictive nature. There are many problems with this reasoning, not the least of which is the absence of any language in the statute itself setting a minimum purity level in order for a substance to be considered

crack cocaine. *See* 21 U.S.C. § 841. That alone is fatal to the claim.

And in fact, other courts have upheld convictions for possession and distribution for crack cocaine where the purity levels were far less than the 75-80% minimum proposed by the defendants. For instance, in *United States v. Pettiford*, 517 F.3d 584, 593 n. 5, 6 (D.C. Cir. 2008), the substance identified as crack cocaine was 71% cocaine base, and the court took note of other cases in which a determination that a substance was crack cocaine was upheld with purity levels of 55% and even 36-44%. In *United States v. Eli*, 379 F.3d 1016, 1021 (D.C. Cir. 2004), the court rejected an argument similar to the one made by the defendants here. Eli argued that the substance could not be crack cocaine in part because the drugs were relatively impure—between 36 and 44% cocaine base—and that crack cocaine was usually 70-90% cocaine base. A chemist in *Eli* testified, however, that the typical purity was actually 50-60%, and that he had tested crack of substantially lower purity than that. *Id.* Therefore, the *Eli* court rejected the same argument proposed here, both by noting that the typical purity for crack cocaine was 50-60%—much lower, we note, than the 75-80% proposed as the minimum by the defendants here—and by recognizing that the purity levels of crack cocaine sold in the street is variable. The defendants' proposed purity levels are nothing more than an arbitrary cut-off without support in the statute or in caselaw interpreting that statute.

As we noted in *United States v. Stephenson*, 557 F.3d 449, 453 (7th Cir. 2009), "[t]his circuit has rejected rigid

definitions of crack, noting that to employ such a rigid definition would invite those in the drug trade to make minor changes in structure, processing, or packaging to avoid the increased penalties for selling crack cocaine." (citing *United States v. Abdul*, 122 F.3d 477, 479 (1997). The purity minimums proposed by the defendants would arbitrarily eliminate a great number of transactions from the reach of the crack cocaine provision, and would in fact provide an easy means for drug dealers to avoid the higher sentencing potential by simply reducing the purity of the crack cocaine they are producing. The defendants apparently believe that the less pure crack cocaine will necessarily be less addictive and therefore is not the type of substance that was of concern to Congress in enacting the statute. That fails to take into account that the substance is still smokeable and therefore delivers a more immediate and intense high than powder cocaine, and that it therefore is addictive and dangerous even at the lower purity levels. And, unlike the freebase form that the defendants mention, crack cocaine can be manufactured fairly easily with little danger to those making it or using it, and therefore is much more widely available. In fact, there was no evidence presented at trial that the freebase form is even available at all in the Englewood neighborhood. The agents and the lab technicians all testified that they had only seen crack cocaine. The defendants' claim of minimum purity levels lacks any support whatsoever, and we reject it.

Nor can the defendants succeed on their void-for-vagueness challenge—an argument raised and rejected numerous

times by this court on similar evidence. *Stephenson*, 557 F.3d at 455. Under the void-for-vagueness doctrine, a statute is unconstitutionally vague so as to violate due process if it: "(1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006); *Stephenson*, 557 F.3d at 455-56. Such challenges are analyzed as-applied unless First Amendment interests are threatened, which is not the case here. *Id.* The defendants contend that even if the statute does not contain a purity requirement, there was no evidence in the record to show that the cocaine base was crack as opposed to freebase and therefore any such determination is arbitrary.

We begin by noting the distinction between powder cocaine, crack cocaine and freebase cocaine as those terms are used by defendants. Crack and freebase cocaine are both forms of cocaine base, as distinguished from the acid form of cocaine, cocaine hydrochloride, which usually takes the form of powder. *United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008). As we explained in *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005) (citations omitted):

> Powder cocaine can be converted back into base cocaine by a process that "frees" the base from the hydrochloride. . . . Cocaine "freebase," popular in the 1970s, is produced by mixing cocaine hydrochloride with ammonia and ether or another organic

solvent. . . . "Crack" is the street name for another form of freebase cocaine, produced by mixing cocaine hydrochloride with baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry, resulting in a rocklike substance. . . . Smokable and therefore more potent than ordinary powder cocaine, crack rivals freebase cocaine in terms of its potency while avoiding the hazards of freebasing, which requires the use of flammable ether. . . . Freed of the hydrochloride, the cocaine returns to its base form—whether in the physical form of crack or otherwise—and is again chemically identical to "cocaine."

We have held that cocaine base in the form of freebase is distinct from crack cocaine and does not fall within the statute. *Id. at* 576-77. Because there is no way to chemically distinguish between crack and freebase cocaine, courts have recognized other means of distinguishing the two. The defendants assert that the experts at trial were unable to distinguish crack from freebase, and that the substance is never identified as crack by the participants to the transaction because "the word crack never appears in the transcript."

The absence of such language is not dispositive as to whether a substance is crack, but in this case there was in fact testimony establishing that the transactions at issue involved crack and not another form of cocaine base. When the agents spoke with Gene Brown, they informed him that they were seeking to purchase crack cocaine, or "rock," and he brought them to Plummer for

that purpose. The drugs then provided by Plummer were consistent in price, consistency, appearance, and chemistry with crack cocaine. That is sufficient to survive a void-for-vagueness challenge, and in fact is similar to the type of evidence held sufficient in other cases. For instance, in *United States v. Kelly*, 519 F.3d 355 (7th Cir. 2008), we upheld a determination that a substance was crack based on the appearance as an off-white rock-like substance packaged in a small Ziploc baggie as was common for crack dealers, and where the dealer at one point had referred to some of it as "rock," a street term for crack. Moreover, in *Kelly* we rejected the speculation by the defendants that the drugs could have been in the form of coca paste which is smoked in the Andes. In *Kelly*, we noted the testimony of a DEA chemist that he had never seen coca paste in his seven-plus years as a forensic chemist. *Id.* at 365. Similarly, the evidence in this case indicated that the forensic chemist had not seen the freebase form of cocaine in her two years at the lab in which she reviewed approximately 550 samples. She testified that the process is almost obsolete largely due to the highly flammable nature of ether. The defendants did not rebut that testimony, offering no evidence that freebase was available in the Englewood neighborhood. Nor did any of the chemical findings support that, as there was no evidence of the presence of ether and the expert testified that the amount of sodium bicarbonate in the sample would not be expected in freebase cocaine. In effect, the defendants rely more on the mere speculative possibility that the drug could have been freebase rather than crack. That is insufficient to establish a void-for-vagueness claim.

Finally, the defendants raise myriad challenges to trial decisions, asserting that in combination those decisions denied them a fair trial. None of these claims have merit, as may be seen in our brief examination of the main claims. The defendants claim that the district court erred in failing to provide for the appointment of an expert witness on the issue of the identification of the substance as crack cocaine. The district court in fact authorized $2,000 for the retention of such an expert witness by the defendants. That is the amount requested by the defendants. Although the defendants now argue that the amount was inadequate to allow them to secure an expert witness, they made no such argument to the district court and did not request additional money from the court. That alone is dispositive of their claim, although we further note that the defendants have failed to identify how such an expert could have aided in this case.

The defendants additionally challenge the government's expert testimony by asserting that the government failed to comply with Federal Rule of Criminal Procedure 16(a)(1)(G). Rule 16(a)(1)(G) requires the government to supply a written summary of any expert witness testimony that the government intends to use, including a description of the witness' opinions, the bases for those opinions, and the witness' qualifications. That summary was provided, and the defendants' contention that the summary must be authored by the expert witnesses themselves is unsupported by either the language of the rule or any caselaw. *See United States v. Yoon*, 128 F.3d 515, 526-27 (7th Cir. 1997); *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995).

Finally, the defendants challenge the experts themselves, contending that the agents who testified that the substance they purchased was crack cocaine could not be properly qualified because they had no basis for determining that it was crack as opposed to a substance such as freebase. As we discussed above, the witnesses had ample basis for determining that the substance was indeed crack cocaine including evidence that: they informed Brown that they were looking for someone to sell them crack and he brought them to Plummer; Plummer sold them a substance that tested as cocaine base and had the color, consistency, packaging and pricing common to crack in the area; the substance contained sodium bicarbonate which would not be expected were it freebase rather than crack cocaine; and the testimony indicated that crack cocaine was readily available in the area but freebase was obsolete, with neither the lab experts nor the undercover agents having seen any deals involving freebase in their years of experience. Experts need not rule out any possible set of circumstances, however unlikely, before they may give an opinion. The defendants had an opportunity to cross-examine the experts on the possibility that the substance was freebase cocaine rather than crack cocaine, and that is all that is required.

The decision of the district court is AFFIRMED.