In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-3528, 09-1529, 09-1631

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS GONZALEZ, MIGUEL AYALA, and
FIDEL S. HERNANDEZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 1023—**John W. Darrah**, *Judge.*

ARGUED APRIL 14, 2010—DECIDED JUNE 15, 2010

Before POSNER, RIPPLE, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* The three defendants pleaded guilty to conspiring to distribute more than 50 grams of mixtures containing cocaine base. Gonzalez and Ayala were sentenced to 120 months in prison and Hernandez to 300 months. Ayala's appeal need not be discussed separately because it presents the same issues as Gonzalez's; Ayala's brief incorporates Gonzalez's by reference.

Common to Gonzalez's and Ayala's appeals is the recurrent issue—which should have been laid to rest long ago—of distinguishing crack cocaine from other forms of cocaine base. Cocaine is the active ingredient of the coca leaf. After extraction from the leaf it is processed into cocaine hydrochloride for export to the United States and other countries by the addition of hydrochloric acid and other chemicals. Cocaine hydrochloride is a powder usually consumed either by being sniffed or by being dissolved in water and then injected. (It cannot be smoked because heating causes it to burn rather than vaporize.) Although cocaine hydrochloride is a salt (a technical term in chemistry), it can be converted to a base by various methods, two of which have been involved in cocaine usage in the United States. The first adds water, and a chemical such as ammonia that removes the hydrochloric acid, and a further chemical, usually ether, to separate the cocaine from any remaining impurities. Pure cocaine is a base, and the cocaine base produced by the method just described is what is called "freebase."

The second method involves dissolving cocaine hydrochloride in a solution of sodium bicarbonate (a "weak base," in chemistry jargon) and water, and boiling the new solution that results. The base produced by this method is called "crack." The cocaine base produced by either method is a hard crystalline substance that when heated vaporizes. The inhalation of the vapor produces a more rapid and intense intoxication than sniffing powder cocaine or even (perhaps) injecting a liquid solution of it.

Freebase was the first form of cocaine base to become popular, but it fell out of favor because it was difficult to make and because the flammability of the ether created a risk of a serious burn injury, as famously befell the comedian Richard Pryor. In the United States today, though there are still freebasers, see, e.g., "Making Cocaine Freebase With Ammonia Methods," www.drugs-forum.com/forum/showthread.php?t=30174&page=2 (visited May 21, 2010), crack is generally believed to be the only form of cocaine base that is widely consumed. *United States v. Plummer*, 581 F.3d 484, 489 (7th Cir. 2009); *United States v. Kelly*, 519 F.3d 355, 364-65 (7th Cir. 2008); *United States v. Griffin*, 173 Fed. App'x 506, 509 (7th Cir. 2006) (per curiam); *United States v. Brigman*, 350 F.3d 310, 314-15 and n. 4 (3d Cir. 2003).

Congress has prescribed a mandatory minimum sentence of ten years for crimes involving 50 grams or more of a mixture containing "cocaine base," 21 U.S.C. § 841(b)(1)(A)(iii), but has not defined the term. The sentencing guidelines also prescribe increased penalties, in the form of higher base-offense levels, for crimes involving "cocaine base," U.S.S.G. § 2D1.1(c)—but define "cocaine base" as "crack." *Id.*, Application Note D. In a series of cases culminating in *United States v. Edwards*, 397 F.3d 570 (7th Cir. 2005), this court has held that the *statutory* term "cocaine base" likewise means "crack"—"the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." *Id.* at 572, quoting Application Note D, *supra*. One reason for our adopting this definition was that pure cocaine—the cocaine in the coca leaf, before any pro-

cessing—is a base, yet no reason has ever been suggested why Congress would have wanted crimes involving unprocessed cocaine to be punished more heavily than crimes involving cocaine hydrochloride. We thought it clear that "Congress intended the enhanced penalties [for crimes involving cocaine base] to apply to crack cocaine and the lesser penalties to apply to all other forms of cocaine." *Id*. at 574, quoting *United States v. Booker*, 70 F.3d 488, 494 (7th Cir. 1995). For evidence that that was indeed Congress's intention see *The Crack Cocaine Crisis, Joint Hearing Before the Select Committee on Narcotics Abuse and Control and the Select Committee on Children, Youth, and Families*, House of Representatives, 99th Cong., 2d Sess. 26 (July 15, 1986); *United States v. Bryant*, 557 F.3d 489, 500 n. 15 (7th Cir. 2009); *United States v. Booker*, *supra*, 70 F.3d at 493-94.

The plea agreements in this case authorized a sentencing enhancement for cocaine base only if the district judge found that the substance sold by the defendants "was cocaine base in the specific form for which enhanced penalties are required as set forth in" the *Edwards* case. The defendants interpret this to mean that the sentencing judge had to find that they had sold crack that had been "produced by mixing cocaine hydrochloride with baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry, resulting in a rocklike substance." This is a quotation from *Edwards* (397 F.3d at 574) in which the qualification "usually" prepared that way and "usually" rocklike, which appears in the earlier definition of crack in *Edwards* (and is also the definition in the guidelines), was omitted.

There was abundant evidence that the cocaine sold by the defendants was crack but little evidence concerning how it had been produced. The usual method is indeed by heating a solution of cocaine hydrochloride and baking soda, the common name for sodium bicarbonate, a weak base as we said. But crack can also, as remarked in several cases, see, e.g., *United States v. Bryant*, *supra*, 557 F.3d at 498-500 and n. 9; *United States v. Abdul*, 122 F.3d 477, 479 (7th Cir. 1997); *United States v. Waters*, 313 F.3d 151 (3d Cir. 2002), be produced by heating solutions of cocaine hydrochloride and other weak bases that, like sodium bicarbonate, strip the chlorine and hydrogen atoms from the cocaine molecule, yielding water, a chloride compound, cocaine base, and whatever is left of the weak base used to do the stripping.

It is a misreading of *Edwards* to suppose that the identity of the weak base used to produce crack was an element of our definition of the word. No one suggests that the precise choice of the weak base is material to the intoxication produced by crack, or to any other aspect of the drug that is perceptible to a consumer or relevant to Congress's decision to punish crimes involving crack more heavily than ones involving other forms of cocaine. Different processes can create the same product: water can be heated on the burner of a stove or in a microwave oven; different software can generate the same images on a computer screen. The defendants' insistence that Congress, and this court in *Edwards*, were concerned not with the end product of creating crack but with the particular weak base normally used to transform cocaine hydrochloride into crack is relevant to no conceivable penological concern.

The reason the issue of whether the cocaine base sold or possessed by a defendant is crack keeps being raised (as indeed it does, see, e.g., *United States v. Plummer, supra*, 581 F.3d at 488-89; *United States v. Betts*, 576 F.3d 738, 744-45 (7th Cir. 2009); *United States v. Brisbane*, 367 F.3d 910, 912-14 (D.C. Cir. 2004)) is dissatisfaction with the "street" definition of crack ("a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form"). Something more technical, more rigorous, more precise is desired but isn't easy to come up with, because *all* cocaine base, unless it contains impurities, has the identical chemical composition. That makes it difficult for chemists to determine whether a given substance is crack, freebase, or some other form of cocaine base, though the different forms might be distinguishable on the basis of physical differences between cocaine crystals distilled out of ether (the freebase method) or left after boiling a solution of cocaine hydrochloride and a weak base (the crack method). And thus in the present case as in most cases some and often all the evidence concerning the drug possessed or sold by the defendant is verbal (for example, "I saw Gonzalez sell crack") rather than the drug itself. The defendants complain that the witnesses used the word crack "colloquially," but crack has only a colloquial meaning; there is no chemical name for it because all forms of cocaine base are chemically the same.

We are hard pressed to understand why after all these years the Justice Department has yet to commission an expert study of the drug trade that would confirm, what

is widely believed, that almost all cocaine base sold in this country is crack. We say "sold" rather than "consumed" because Internet sources indicate that some drug users who want the faster, more intense high produced by cocaine base but don't want to buy street-quality crack are continuing to make and consume their own freebase. See, e.g., "Making Cocaine Freebase With Ammonia Methods," *supra*. Even when freebasing was popular, users purchased powder cocaine and prepared the freebase themselves, using kits that contained ether, instructions, and the necessary equipment, rather than buying the freebase. Edith Fairman Cooper, *The Emergence of Crack Cocaine Abuse* 88-89 (2002); Dorothy K. Hatsukami & Marian W. Fischman, "Crack Cocaine and Cocaine Hydrochloride: Are the Differences Myth or Reality?" 275 *Journal of the American Medical Association* 1580 (1996); "Melting Down," *Time* (Apr. 11, 1983) www.time.com/time/magazine/article/0,9171,923501,00.html (visited May 21, 2010); 21 U.S.C. § 863(d)(15).

If the rarity of the sale in the United States of any cocaine base other than crack (not only freebase but also coca paste, which is smoked in South America, *United States v. Kelly*, *supra*, 519 F.3d at 365) were confirmed statistically (we haven't found any statistics on sales of the different forms of cocaine), there would be minimal danger that a witness was using the word "crack" to refer to some other form of cocaine base, or that a dealer in cocaine base was dealing in something other than crack. A study such as we have suggested would go far to dissolve issues concerning the nature of the product in which a defendant charged with a crack offense

dealt. Still, there is sufficient expert evidence, albeit qualitative rather than quantitative, that the sale of any form of cocaine base other than crack is rare, *United States v. Plummer, supra*, 581 F.3d at 489; *United States v. Kelly, supra*, 519 F.3d at 364-65; *United States v. Griffin, supra*, 173 Fed. App'x at 509; *United States v. Brigman, supra*, 350 F.3d at 314-15 and n. 4, to allay, in conjunction with the evidence in this case (and bearing in mind that the burden of proof on the government in a sentencing hearing is merely the preponderance standard, not proof beyond a reasonable doubt, and that the rules of evidence do not apply to sentencing hearings), any concerns about Gonzalez's and Ayala's sentences.

Defendant Hernandez raises four issues. One is whether Rule 410 of the federal evidence rules was violated by the introduction at the sentencing hearing, as evidence of drug quantity, of statements that Hernandez had made in the course of plea bargaining. Admissions generally are admissible—and very important—evidence; and Rule 410(4) (which Fed. R. Crim. P. 11(f) applies to "the admissibility or inadmissibility of a plea, a plea discussion, and any related statement") makes admissions in plea bargaining inadmissible only if the plea bargaining either does "not result in a plea of guilty" or results "in a plea of guilty later withdrawn." Neither condition is satisfied here. *United States v. Paden*, 908 F.2d 1229, 1234-35 (5th Cir. 1990); 1 *McCormick on Evidence* § 160 (6th ed. 2009). Statements in plea discussions that result in a guilty plea that is not withdrawn *have* to be admissible—they are the basis on which the judge decides whether to accept the plea and are also

an important basis for deciding on the length of the sentence.

Anyway the rules of evidence, other than those that enforce privileges, are inapplicable to sentencing. Fed. R. Evid. 1101(d)(3); *United States v. Atkin*, 29 F.3d 267, 268 (7th Cir. 1994). "[T]he only requirement is that the evidence supporting the sentence must be reliable." *United States v. Cooper*, 591 F.3d 582, 591 (7th Cir. 2010). That requirement was satisfied by Hernandez's admissions.

Hernandez was given an enhanced sentence for possessing a gun (actually two guns) in connection with a drug offense. U.S.S.G. § 2D1.1(b)(1); *United States v. Are*, 590 F.3d 499, 526 (7th Cir. 2009). He had been stopped by the police while driving with his girlfriend, and the police had found crack in her possession. Hernandez made a deal with the arresting officers: they would let her go for now in exchange for his surrendering two guns to them. He got two guns from fellow members of his drug gang and gave them to the police as he had promised. Obviously he possessed the guns when he gave them to the police, and the drug conspiracy of which he was convicted continued into the period in which he delivered the guns and he admitted that the girlfriend was a member of the conspiracy. So the guns were possessed by him in connection with a conspiracy (as in *United States v. Acosta*, 534 F.3d 574, 588 (7th Cir. 2008)), the connection being established by the fact that he used them to obtain at least temporary freedom for a coconspirator. Police are eager to take criminals' guns out of circulation, see *United*

*States v. Foster*, 166 Fed. App'x 13, 18 (4th Cir. 2006) (per curiam); Daniel D. Polsby, "Firearms Costs, Firearms Benefits and the Limits of Knowledge," 86 *J. Crim. L. & Criminology* 207, 219 (1995), and this makes guns a form of currency by which drug dealers and other criminals can obtain concessions from the police that help them stay in business. An FBI agent testified at Hernandez's sentencing hearing that it is the "routine operation or practice of the Chicago police officers, beat officers on the street in uniform, [to stop] people and hav[e] them obtain firearms in exchange for negotiated decisions not to arrest, or reduced charges or such things as that."

Hernandez complains about a further sentencing enhancement that he received, for obstruction of justice. U.S.S.G § 3C1.1. After being arrested and told that he would be prosecuted for drug offenses, he agreed to cooperate with the government and on the basis of that agreement was released from jail. Part of the agreement was that he would keep in touch with the prosecutors. But after a month he moved to Florida without telling them and was there for two years before being apprehended and brought back to Chicago to stand trial.

He argues that he was merely fleeing, and points out that flight as such is not a ground for the enhancement. U.S.S.G. § 3C1.1, Application Note 5(d); *United States v. Hagan*, 913 F.2d 1278, 1284-85 (7th Cir. 1990); *United States v. Burton*, 933 F.2d 916 (11th Cir. 1991) (per curiam); *United States v. Garcia*, 909 F.2d 389, 392 (9th Cir. 1990); *United States v. Stroud*, 893 F.2d 504, 507-08 (2d Cir. 1990). Instead

the cases suggest a distinction between "panicked" or "instinctual" flight, "mere flight in the immediate aftermath of a crime," or "spontaneous" flight ("the instinctive flight of a criminal about to be caught by the law," as we put it in *United States v. Hagan*, *supra*, 913 F.2d at 1285), on the one hand, and "calculated evasion," or "a deliberate pre- or post-arrest attempt to frustrate or impede an ongoing criminal investigation, as in the case of an individual who flees while being sought for questioning some time after the commission of a crime," on the other hand, and say that only the latter is obstruction of justice. See, besides the cases just cited, *United States v. Arceo*, 535 F.3d 679, 687 (7th Cir. 2008); *United States v. Porter*, 145 F.3d 897, 901-04 (7th Cir. 1998); *United States v. Draves*, 103 F.3d 1328, 1336-38 (7th Cir. 1997); *United States v. Walcott*, 61 F.3d 635, 639 (8th Cir. 1995); *United States v. Madera-Gallegos*, 945 F.2d 264, 266-68 (9th Cir. 1991).

But the adjectives obscure a simpler distinction. While anything a criminal does to avoid being caught increases the burden on law enforcement and so could be thought an obstruction of justice, to reason thus would lead to the strange result that every defendant who had not turned himself in immediately upon commission of his crime would receive the enhancement. Whether a decision not to turn oneself in forthwith after committing the crime is attributable to panic, instinct, or calculation is neither here nor there. It is the conduct, not the state of mind, that distinguishes initial flight from obstructive conduct. True, the obstruction of justice guideline requires "willful" obstruction of

justice, U.S.S.G. § 3C1.1, and the cases (naturally) echo this. E.g., *United States v. Arceo, supra*, 535 F.3d at 687; *United States v. Draves, supra*, 103 F.3d at 1338; *United States v. Burton, supra*, 933 F.2d at 918. But because of limitations on mind reading, willfulness usually has to be inferred from conduct rather than being determined directly. E.g., *Ratzlaf v. United States*, 510 U.S. 135, 149 n. 19 (1994) ("willfulness 'is usually established by drawing reasonable inferences from the available facts,'" quoting *United States v. Bank of New England, N.A.*, 821 F.2d 844, 854 (1st Cir. 1987)); *United States v. Scott*, 660 F.2d 1145, 1160 (7th Cir. 1981); *United States v. Beidler*, 110 F.3d 1064, 1069 (4th Cir. 1997). If you shoot someone between the eyes at 100 yards with a sniper rifle, your testimony that it was an accident is unlikely to be believed. In like vein *United States v. Reeves*, 586 F.3d 20, 26 (D.C. Cir. 2009), observed that "because [the defendant's] conduct was inherently obstructive, the [district] court was permitted to infer Reeves' willfulness, and therefore it would have been futile to argue Reeves lacked the subjective intent to obstruct justice based on the lack of a court order."

Obstruction generally and in this case begins when there has been no initial flight (remember that Hernandez was cooperating with the police until he decided to decamp for Florida), or when flight ends. But there is "flight plus"—unusually elaborate, pertinacious, or dangerous efforts to avoid being captured in the first place, as in such cases as *United States v. White*, 903 F.2d 457, 461-63 (7th Cir. 1990); see also *United States v. Bliss*, 430 F.3d 640, 647-51 (2d Cir. 2005); *United States v. Walcott*, *supra*, 61 F.3d at 639; *United States v. Madera-Gallegos*, *supra*,

945 F.2d at 267-68. Hernandez was released in exchange for promises to cooperate and to keep in touch, broke his promises, created delay and expense, and so merited the enhancement. See *United States v. Arceo*, *supra*, 535 F.3d at 687; *United States v. Porter*, *supra*, 145 F.3d at 903-04; *United States v. Walcott*, *supra*, 61 F.3d at 639; *United States v. Mondello*, 927 F.2d 1463, 1466-67 and n. 4 (9th Cir. 1991).

Hernandez's last argument is that he should not have been denied a sentencing discount for acceptance of responsibility just because he was found to have obstructed justice. He is right that a finding of obstruction of justice does not automatically preclude a finding that the defendant accepted responsibility for his crime. In *United States v. Buckley*, 192 F.3d 708, 711 (7th Cir. 1999), we gave the example of a defendant who when first questioned by the police had denied possessing an illegal weapon but the next day gave a complete confession and later pleaded guilty. We said that he might deserve an enhancement for the obstruction of justice yet at the same time earn a discount for having fully, if slightly belatedly, accepted responsibility for his crime. And in *United States v. Lallemand*, 989 F.2d 936, 938 (7th Cir. 1993), we upheld the enhancement over the defendant's objection that the award to him of the sentencing discount for acceptance of responsibility should have precluded a sentencing increase for obstruction of justice. We said, as in *Buckley*, that one "can have the act of obstruction or attempt to obstruct at time $t$, and the acceptance of responsibility at time $t + 1$. There is no logical or practical incompatibility, and no barrier in the language of

the guidelines." See also *United States v. Travis*, 294 F.3d 837, 841 (7th Cir. 2002); *United States v. Mayberry*, 272 F.3d 945, 949 (7th Cir. 2001).

A note to the sentencing guidelines states that when a defendant receives a sentencing enhancement for obstruction of justice the case must be "extraordinary" to warrant a discount for acceptance of responsibility. U.S.S.G. § 3E1.1, Application Note 4; see, e.g., *United States v. Keeter*, 130 F.3d 297, 299 (7th Cir. 1997); *United States v. Jeross*, 521 F.3d 562, 581-82 (6th Cir. 2008); *United States v. Campos*, 362 F.3d 1013, 1016-17 (8th Cir. 2004). The judge in the present case said the case was not extraordinary and the government says the case was not extraordinary; neither offered any explanation for so concluding but we suppose it seemed obvious to them—and it is obvious. The purpose of the sentencing discount for acceptance of responsibility is to reduce the burdens of trial to prosecutors, judges, victims, jurors, and witnesses by inducing defendants to plead guilty. *United States v. Woodard*, 408 F.3d 396, 397-98 (7th Cir. 2005); *United States v. Morgano*, 39 F.3d 1358, 1377-78 (7th Cir. 1994); *United States v. Tolson,* 988 F.2d 1494, 1498-99 (7th Cir. 1993). The distinct notion that judges can determine from words rather than deeds (deeds such as pleading guilty) whether a defendant is truly remorseful is increasingly recognized to be implausible. Michael M. O'Hear, "Appellate Review of Sentences: Reconsidering Deference," 51 *Wm. & Mary L. Rev.* 2123, 2142-47 (2010); O'Hear, "Remorse, Cooperation, and 'Acceptance of Responsibility': The Structure, Implementation, and Reform of Section 3E1.1 of the Federal Sentencing

Guidelines," 91 *Nw. U. L. Rev.* 1507, 1554-56 (1997); Bryan H. Ward, "Sentencing Without Remorse," 38 *Loyola U. Chi. L.J.* 131, 133-36, 164-67 (2006); Craig S. Lerner, "Reasonable Suspicion and Mere Hunches," 59 *Vand. L. Rev.* 407, 450-51 (2006). As one district judge (unidentified) is quoted as saying in Stanton Wheeler, Kenneth Mann & Austin Sarat, *Sitting in Judgment: The Sentencing of White-Collar Criminals* 117 (1988), "If you give too much consideration to it [remorse] then you are a sitting duck, I suppose, for sham protestations of remorse and breast-beating, and buckets of tears and appeals of sympathy."

We thus noted in *United States v. Beserra*, 967 F.2d 254, 256 (7th Cir. 1992), our preference for "deeds over words—external, verifiable, expiatory acts over self-serving, unverifiable reports of interior mental states. Not only are deeds better evidence than words ('putting your money where your mouth is'), but they have value to the law-enforcement authorities, compared to which breast-beating before the sentencing judge is a debased currency indeed. It is better to credit a defendant for doing something of value to someone than for retaining a lawyer who can help him craft a spiel that will tread the delicate line between making excuses and confessing a will to evil. Bessera has no expiatory deeds." In a case such as this in which a two-year manhunt is necessary to bring the defendant to trial after he procured his release from jail by promising to cooperate and keep in touch, the burden on law enforcement imposed by the obstruction of justice is bound to exceed any plausible benefit to law enforcement from his plea of guilty. The two-level reduction in Hernandez's offense level that

he sought for acceptance of responsibility would if granted have negated the two-level enhancement that he received for obstruction of justice; his initial cooperation would have bought him the right to become a fugitive from justice.

AFFIRMED.